Tilghman, C. J.
A bill of indictment having been found against the three prisoners during the present session of this Court, for the murder of Samuel Alwine, they put in a plea, supposed by them to be of the same import as a plea of autrefois acquit, to which the attorney for the Commonwealth *579 demurred, and the prisoners joined in demurrer. The prisoners have likewise entered on the record a motion to be discharged from this indictment for the same reasons as are set forth in their plea. The plea is, in substance, as follows: ‘That at a former Court of Oyer and Terminer, held before the Judges of the Court of Common Pleas for the county of Philadelphia, in the months of April and May last, they were indicted for the same murder, whereupon they pleaded not guilty, and issue having been joined, a jury was sworn, evidence given for the Commonwealth and for themselves, pleadings of counsel heard on both sides, and a charge delivered by the Court to the jury. At half an hour past nine in the evening of the 1st May, the jury retired to consider of their verdict. They returned to the Court several times, without having agreed, and being sent back by the Court, they came in for the last time about half past twelve in the afternoon of the 2d May, having been out in the whole about fifteen hours. Being then asked whether they had agreed on their verdict, they answered, that they had agreed as to two of the prisoners, and had not agreed as to the third, nor was there the least probability of their agreeing. Thereupon, the Court refused to permit the jury to pronounce the verdict which they had agreed upon, and without, and against the consent of the prisoners, the jury were discharged by the Court from saying any thing of their verdict in and upon the premises.
Before I enter on the question, I think proper to declare, that I have no doubt of the integrity of the learned Court by which this jury was discharged. And however my opinion-may differ from theirs, it must be confessed, that as to the general discretionary power of discharging juries, they are not without countenance from Judges of high character in other States.
In considering this matter, I shall confine my opinion to the case before the Court, which is a case of murder, a crime of which one species, viz: of the first degree, is punishable by our laws with death.
Concerning the power of the Court to discharge a jury in a capital case, Judges have not always agreed. It is one of those questions which remained long unsettled, nor even yet has any general rule been established which embraces all eases. Indeed, from the nature of the thing, such a rule is *580 .not to be expected. The Judges have, therefore, thought is safest to decide, from time to time, the cases which have keen brought before them, taking care not to commit themselves on general principles. There is, indeed, one princiP^e which cannot be contradicted, and that is, that the jury may be discharged in cases of absolute necessity; but what constitutes that necessity has been ascertained only in the particular cases that have arisen. There was an ancient tradition among the English lawyers, that a jury charged in a capital case, could not be discharged without giving a verdict, even -with the consent of the attorney general and the prisoner. This is laid down for law by Sir Edward Coke, in his 1 List. 2%7b; and 3 Inst. 110. It is a doctrine altogether unreasonable; for why should not the jury be discharged, when it is desired by all parties interested in the verdict? Accordingly, we find that it could not stand, though supported by so great a name. Lord Coke cited a case in the Tear Books, 21 Edw. III., which being.thoroughly examined, was found not to support his opinion. The matter was fully discussed in the case of the Kinlocks, Foster, 22, and the law, in cases of consent, settled on a foundation too firm to be shaken. The Kinlocks ¡-having been indicted for treason, pleaded not guilty, and were put upon their trial; and after the jury were sworn, they asked permission to withdraw their plea, in order to plead another matter of which they were advised they could not have the advantage on the general issue. Leave was given, with the consent of the attorney general, and a juror withdrawn, after which their second plea being overruled, they were tried by another jury and convicted of high treason. They then moved in arrest of judgment, because the first jury had been discharged ; but it was decided by nine Judges against Wright, (the only dissentient,) that the discharge of the jury was legal, and judgment was pronounced against the prisoners. - We may conclude, then, that in cases of consent, fairly given, xvhere the prisoner is assisted by counsel, and the discharge of the jury is intendedfor his benefit, they may be discharged without giving a verdict. But that is not the present case, for the prisoners expressly dissented. If the proceedings of the Court can be supported, then it must be on the principle of necessity. And it is contended, that upon this ground it may be supported, because, when the jury are so exhausted as not to be able to *581 continue their deliberations, they must either be discharged or perish. If that were the alternative, no doubt they ought to be discharged ; but I cannot perceive any such necessity on this record, although the Court appears to have recorded very fairly all the circumstances of the case. Indeed, as to two of the prisoners, there was evidently no necessity, because, as to them, the jury were prepared, and offered to give their verdict. -I presume the Court was of opinion that the verdict could not be taken unless it embraced all the prisoners, and, therefore, the necessity extended to all. If the law were so, it would certainly be a reflection on the administration of justice ; for it is flagrantly, unjust that one who had put himself for life or death on a jury of the country, and had satisfied that jury of his innocence, after a full hearing of the evidence, the pleadings of counsel on both sides, and the charge of the Court, should be deprived of the benefit of a verdict, because the jury could not agree on the guilt or innocence of another person who happened to be tried with him. If the prisoners had been tried by different juries, as they might have been, though charged in the same indictment, no question of this kind could have arisen. And yet, where is the difference, or why should their cause be the worse because all were tried together ? Their offences were distinct; and it is not denied that the jury might have convicted some and acquitted others. They had a right to sever in their challenges, which shews that the law protects their several rights. It is true, that a verdict may be called an entire thing, though it includes the case of several persons. Yet it is a zohole, consisting of parts essentially distinct; so that, in substance, there are as many verdicts ar'e there are defendants. When the jury are about to give their verdict, they are asked as to each of the prisoners, severally, Is A. guilty or not ? Is B. guilty or not? Is C. guilty or not ? Extraordinary indeed, then, must it be, if the case of the prisoners is to be considered as several, in all these minor points, and yet joint as to the verdict on which their lives depend. Nothing less than the most imperious authority should induce the Court to yield to such a doctrine. But I am happy to find that the authorities place us quite at ease. It is unnecessary to give an opinion on the law in civil cases. There are two cases in 21 Finer, 481, (Trial S. g. pi. 1 and 2,) one of which is reported in 12 Mod, 2Y5, the other in 3 Salé. 362, *582 from which it may be collected, that as the law was then held . in actions against several for a joint trespass, if some were acquitted and others unjustly convicted, the Court would not grant a new trial, because it could not be done without putting those who were acquitted to a second trial. And yet, in joint trespass against several defendants, where no evidence is given against one, it has been the practice to take a verdict for him, and then suffer him to be a witness for the others. 1 Phill.Ev.61. Bull. N.P.Gilb. Ev. 117, & Binn.3l&. 3Esp. N. P. Cases, 25. Now, in such a case, if the other defendants should be convicted, against evidence, I should suppose the Court would ponder well before it suffered justice to be defeated by a technical difficulty. The difficulty is, that the new venire facias must include all the defendants. The ingenuity of the Court, which it would be their duty to exert in such a cause, might, I should think, find means to evade or conquer this objection. In civil cases, however, I will only say, that I do not consider it as settled, that a new trial cannot be granted for some of the defendants only. As to criminal cases, it was decided, in Fern's Case, HU. Term, 27 and 28, Car. 2, mentioned in Buller's NisiPrius, 326, that in an information exhibited against three, and verdict against all, a new trial might be granted as to one only. Upon this case Buller makes the following remarks: “ Yet the authority of this case may be well doubted j for where there were several defendants, and the verdict, as to some, was against evidence, yet the Court would not grant a new trial, for they said the verdict must stand or fall in toto." And for this, he cites Collier v. Morris, Mich. 1755, and Captain Crabb’s Case, Mich. 23, Geo. II. The authority of Buller is of weight. His opinion was, however, bottomed altogether on the cases he cited. No good reason is given in support of it; and it has been since overruled as unreasonable, and tending to obstruct justice. These are English authorities: Let us now turn to our own country. In Pennsylvania, I know of no authority in point. In The People v. Olcott, 2 Johns. Cases, 301, as I understand the report of the case, two were indicted for conspiracy, and tried by the same jury. As to one, there was a verdict of acquittal, but as to the other, the jury, not being able to agree, were discharged by the Court. This was before the Supreme Court of New Fork. It is not quite certain, however, that both the defendants were tried by the *583 sainé jury. The report is not so clear as could be wished on that point. But in the case of the Commonwealth v. Wood, in the Supreme Court of Massachusetts, 12 Mass. Rep. 313, there is no doubt. Two were indicted for larceny, the jury acquitted one, and were discharged as to the other, because they could not agree. That is precisely the case before us, and I embrace the principle of the Court of Massachusetts in receiving the verdict with all my heart, because it advances justice and prevents injustice. I- conclude, then, that the verdict ought to have been received as to two of the prisoners. But what was that verdict, and to which of the prisoners did it relate ? On both these points the record is silent. In such a case, I think-myself bound to presume in favour of the prisoners, that it was a verdict of acquittal. But I can make no presumption as to the persons intended tobe acquitted. What, then, is to be done ? Parol evidence cannot be received. It must, therefore, remain unknown which of the thrée prisoners occasioned the doubt in the minds of the jury, and who were the two they had agreed to acquit. Under these circumstances, it would be impossible to order either of them to a second trial without the hazard of exposing one of those whom the jury had agreed to acquit. There is no certainty, therefore, of avoiding injustice but by saying that neither of them shall be brought to a second trial. This is my opinion, considering the case simply on the refusal of the Court to receive the verdict. But another and much more important view remains to be taken. In considering the refusal to receive the verdict, I have supposed that the record exhibited a case of necessity, which would have authorised the Court to discharge the jury from that part of their verdict in which they had not come to an agreement. But this is denied by the counsel for the prisoners ; and it is a question which demands our most serious deliberation. In the state of purity and independence in which I verily believe the judiciary of the several States, as well as of the United States, at present stands, there might be no danger of oppression fro,m its enjoyment of a very large discretionary power as to the discharge of juries. But other times may come, in which other Judges might abuse their discretion, and it is fortunate, perhaps, that the point has occurred now, when the subject may be considered without prejudice or passion, tn this Commonwealth, we allow the authority of the English *584 decisions down to the 4th July, 1776. I will, therefore, first consider the English law as it then stood. I am not aware of any established principle of English law, at that day, by which the Court could discharge a jury merely because they could not agree, even in a civil case ; but in a criminal and capital case, I take it to be quite clear, that the Courts did not consider themselves as invested with any such authority. It was not until the case of the Kinlocks, (in 1746,) that this subject seems to have been well considered. Many bad precedents are to be found in the latter part of Charles II. and the whole of James IPs reigns , but these were disregarded after the revolution in 1688. The rebellion of 1745, in which the Kinlocks took part, excited warm passions ; but the opinion of Sir Michael Foster, delivered in that case, is so replete with candour, learning, and good sense, that we cannot but admire it. That was a case in which the jury was discharged at the request of the prisoners, assisted by able counsel, and with the intent of imparting to them a privilege which they could not otherwise have enjoyed. But there is not to be found in Foster’s opinion, any vestige of an argument in favour of the power to discharge a jury, merely because they could not agree. Indeed, I think it is manifest that his opinion was to the contrary ; for, in his remarks on Mansell’s case, (reported in 1 And. 103,) he thus expresses himself: “ The truth of the case was no more than this: the jury were not agreed on any verdict at all, and, therefore, nothing remained to be done by the Court but to send them back, and keep them together, until they should agree to such a verdict as the Court could have received and recorded.’* And, now that I have mentioned this case of Mansell, it is proper to remark, that there, the Court seemed to be aware that it had no power to discharge the jury without the prisoner’s consent, (who was on his trial for murder,) for it took the precaution of obtaining his consent, and placing it on the record ; for which proceeding Foster censures the Court— <<• For,” says he, “ the prisoner ought not to have been drawn into any consent at all, for, in capital cases, I think the Court is so far of counsel with the prisoner, that it should not suffer him to consent to any thing manifestly wrong, and to his own prejudice.” Serjeant Hawkins lays it down, (book 2, ch. 47, sect. 1,) “ that a jury sworn and charged in a capital case, cannot be discharged without the prisoner's consent, till *585 they have given a verdict, and notwithstanding some authorities to the contrary in the reign of king pilarles II., this hath been holden for clear lazv, both in the reign of king James II, and since the revolution.” Although this rule is laid down generally, yet it is to be understood that cases of necessity are excepted. It is to be considered, then, what those cases are. There is a class of cases which depend on what may be called the necessity of doing justice; such as where the prisoner has tampered with some of the jury, or has contrived to keep back the witnesses for the prosecution. It was once thought necessary in England to discharge a jury, (2fübá.295,) where it was found that the evidence for the King was defective, and the attorney general suggested that sufficient evidence might be had another time. So where the indictment had been badly'drawn by the negligence'of the Crown officer. Such reasons, (I mean, want of evidence, or negligence in drawing the indictment,) would not be listened to in this country. This class of cases does not comprehend that before the Court, and I only mention it to shew ,that there may be a kind of necessity arising from the duty of the Court to guard the administration of justice against fraudulent practices. But the necessity which applies to the present question is absolute ; and I will mention some of the cases from which its nature may be understood. It is said by Lord Hale, (•1 Hale, 34, 35,) that if the prisoner, after his plea, and before trial, becomes insane, he shall not be tried ; and if after his trial, he becomes insane, he shall not receive judgment; and if after judgment, he becomes insane, his execution shall be spared; because, if he was of sound mind, he might allege something in stay of judgment or execution. He has omitted the case of insanity' happening during the trial; but, upon the principle of the other cases, no doubt in such case the jury should be discharged from giving a verdict. In the case of Elizabeth Meadow, (Foster, 76, A. D. 1750,) the prisoner was taken in labour during the trial, and the jury were discharged. So the jury has been discharged where one of the jurymen fell down in a fit, and was unable to proceed in his duty. And Sir M. Hale mentions a case, (2 Hale, 295,) where, after the jury were sworn and departed from the bar, one of them xvent out of tozan ; the other eleven were discharged, and the one who went out of town was fined for his misbehaviour, and the prisoner tried by another jury. A jury *586 has' likewise been discharged on account of the intoxication 0j one 0j t/lg jurors¡> which rendered him incapable of per-f°rm'nS his duty. These are the English cases, and not one of them touches the principle on which the jury were discharged in the present case, that is to say, because they could not agree upon a verdict. When we look to the State of Pennsylvania, we must, first of all, advert to her Constitution, art. 9. sect. 10, by which it is declared, “ that no man shall, for the same offence, be twice put in jeopardy of life or limb.” Where one is tried and acquitted on a bad indictment, he may be tried again, because his life was not in jeopardy. The Court could not have given judgment against him, if he had been convicted. But where the indictment is good, and the jury are charged with the prisoner, his life is undoubtedly in jeopardy during their deliberation. If they are divided in opinion, and especially if there should be a great majority in favour of the prisoner, he has gained an advantage of which he is deprived if the Court discharge the jury. I grant that in case of necessity they maybe discharged; but if there be any thing short of absolute necessity, how can the Court, without violating the Constitution, .take from the prisoner his right to have the jury kept together until they have agreed, so that he may not be put in jeopardy a second time ? We should look at both sides of the question, and not forget that, in our anxiety to relieve the jury, we may be sacrificing the life of the prisoner. In the next place, it is to be observed, that in this State there is neither adjudged case nor tradition to warrant the discharge of this jury. I think myself safe in asserting, that there is no evidence of any instance since William Penn obtained his charter from Charles //., in which a jury was discharged without the consent of the prisoner in a capital case. The general understanding has been against it, and of this, powerful evidence is to be found in the act of 21st March, 1806, in which the ancient oath of a juryman is altered ; but the alteration is confined to civil cases. In those cases, the oath prescribed by the act is to give a true.verdict according to the evidence, unless dismissed by the Court, or the cause be -withdrawn by the parties'’ Two inferences arise from this act: 1st. That it was not supposed that the Court had power to discharge the jury, at their discretion, even in civil cases. 2d. That it was not thought expedient to give them that power in criminal cases. *587 And, indeed, the expediency of investing the Courts t#lh such power in capital cases, tnay be well questioned, notwithstanding the opinion of Judges of high standing in some of our sister States. There is strong proof of its not being necessary, from the fact of its never before having been exercised in Pennsylvania. Indeed, in general, the task of a jury is not hard in capital cases, because, when the evidence leaves reasonable ground for doubt, it is their duty to acquit. But a case may arise in which a jury may find great difficulty in agreeing, and some of them may be so exhausted as to put their health in danger. No one can think for a moment that they are to be starved to death. God forbid that so absurd and inhuman a principle should be contended for. Very far from it. The moment it is made to appear to the Court, by satisfactory evidence, that the health of a single juryman is so affected as to incapacitate him to do his duty, a case of necessity has arisen which authorises the Court to discharge the jury. But it is said to be in vain to keep people together for-the purpose of agreeing, when it is certain they never will agree. But by what evidence is the Court to arrive at this certainty ? There is nothing for it but the declaration of the jurors, that they never can agree. Now nothing is more delusive than that kind of evidence. I have repeatedly known a jury to declare, that they never could agree, and yet when assured by the Court that they could not in conscience permit their discharge, they have agreed, and that, too, in no great length of time. But once establish the principle, that the Court has a right to discharge them, in capital cases, merely because they cannot agree, and we shall probably have few verdicts in cases of murder. In such cases there is already considerable difficulty in procuring a jury. Some persons think it criminal to be instrumental in taking the life of a man, even under the sanction of law. This Court has recently been reduced to the painful necessity of inflicting penalties on two respectable members of a respectable Society, because they absolutely refused to serve on the jury, and the prisoners would not consent to their discharge. Now all persons of that description, rather than submit to fine and imprisonment, might safely serve as jurors, under a certainty of being discharged without giving a verdict, after a few hours fasting. These are some of the reasons which induce me to doubt whether any good would arise from a change in the law, if *588 the Court had power to change it, which it certainly has not. That is a power which belongs to the Legislature.
I will now take notice of the decisions in the Courts of other States, and it will be found that not one of them was in a caPltal case. The counsel for the Commonwealth has contended for the broad principle, that the Court has a discretionary power to discharge the jury in all cases. But this is expressly contradicted by the Supreme Court of New Tork, on whose decisions, as to the power of discharging juries, the counsel for the Commonwealth relies, for that Court decided, in the case of The People v. Barrett & Ward, 2 Caines’ Cases, 100. 304, that where the jury were discharged against the consent of the defendants, (in a case of misdemeanor only,) because the district attorney was not prepared with evidence to support the prosecution, such discharge was equivalent to an acquittal, and the defendants could never 'be brought to trial again for the same offence. The case of The People v. Olcott, 2 Johns. Cases, 301, was a misdemeanor. The opinion of the Court was delivered by Kent, J. who considered the subject thoroughly, and went through all the cases at that time reported. He was clear in opinion, that the Court had a right to discharge the jury when satisfied that they never could agree. But he confined his opinion to the case before him, and I remark the following expressions: “ If the question in capital cases be doubtful, there is nothing to render it so in cases of misdemeanor.” The case of The People v. Denton, 2 Johns. Cases, 275, was also a misdemeanor. The, Court said, “ That the power of discharging a jury in cases of 'misdemeanor, as in civil cases, rests in sound discretion, and’-is to be exercised with great caution. Where every reasonable endeavour has been used to obtain a verdict, and it is found that the jury cannot, or will not, agree, they must, of necessity, be discharged.” The case in 2 Day. 504, (Connecticut,) was a misdemeanor. The People v. Goodwin, 18 Johns. 187, was a case oifelony, (manslaughter,) butit did not touch the life of the prisoner. Spencer, C. J. delivered the opinion of the Court, and cited, with approbation, the case of The People v. Olcott. His argument, it must be confessed, reached to all cases of felony, but still he confined his opinion to the case before the Court, in which there was an ingredient of some weight, not found in any other case ; and that was, that the legal termination of the Sessions was to be *589 in half an hour, and there was a moral certainty that the jury would not agree in so short a time. ■ The United States v. Coolidge, was before Story, J. It was a case of misdemeanor; and after the jury was sworn, an essential witness for the United States, from scruples of conscience, refused to take the oath prescribed by law. The Court suspended the trial, in hopes that the witness, who was committed for contempt, would get over his scruples before the end of the Term ; and he did get over them, but the cause was not tried. The indictment was quashed, because it had been found in part on the evidence of the same witness who had been before the grand jury, and given his evidence without being legally sworn. The case of The Commonwealth v. Bowden, was decided by the Supreme Court of Massachusetts, 9 Mass. 494. It was an indictment for a highway robbery, which, I understand, was not, at that time, a capital felony. The jury was discharged, because they said they never could agree. The authority of this Court is great; but, from the report of the case, the subject does not seem to have undergone much discussion or consideration. The Court said, “ That the ancient strictness of the law, in that respect, had very much abated in the English Courts, nor would it be consistent with the genius of our Government to use compulsory means to effect an agreement among jurors.” I presume it could not have'been intended to apply these expressions to capital jelonies ; for, as to them, there can be no ground for saying, that the English Courts of the present day have assumed the right of discharging the jury because they could not agree. In other respects, their strictness has been relaxed, particularly in the adjournment of a jury in cases of high treason, without the consent of the prisoner. These are all the American authorities which have been cited, and none of them come up to the case before us.
Upon the whole, then, this is a case which affects the lives of the prisoners ; and the jury were discharged without, and against the consent of the prisoners, merely because they had not agreed, and said they never could agree as to the case of one of the prisoners, though, as to two of them, they had agreed, and were ready to give their verdict, if the Court would receive it. In such a case, I may be permitted to doubt whether the Judges who have discharged juries in other States, (for whose characters I entertain the most un *590 feigned respect,) would not have paused before they discharge ecl the jury, and thus took away from the prisoners that chance for life which they were unwilling to relinquish. For my own part, thinking that their blood would be upon us if were convicted of murder in the first degree on a second trial in this Court, I am of opinion, that they should be discharged from this indictment.
Duncan, J.
After the very clear and elaborate opinion we have just heard, in which I entirely concur, nothing but the importance of the general question, would require from me more than a silent concurrence; but the importance of the principle, and the supposed difficulty of the point in question, render'it proper that I should publicly give the reasons on which my opinion is founded. The subject has been already so much exhausted, the decisions of the Courts, and the opinions of elementary writers so fully reviewed and considered, • that entering again into a minute examination of them would be superfluous, and an unwarrantable consumption of time. Whether it be only a general tradition of the law, founded, as some suppose, on a mistake of the authorities, or a sound, legal principle, I will not undertake to say ; as a general rule, it has received the sanction of the most eminent Judges, and the recognition of the ablest writers on the criminal law, that “ a jury, sworn and charged, in a case of life or member, cannot be discharged by the Court or any other, but ought to give a verdict.” It is clear, that the rule is not now received as a universal one; but there is, at this day, a settled and uneontroverted rule, “that in a case of life or member, a jury sworn and charged, cannot be discharged before they give a verdict, unless with the consent of the prisoner, and where it is for his benefit, or in cases of extreme necessity and if a jury is otherwise discharged, it clearly amounts to an acquittal of the prisoner. I will pursue the order taken by Judge Foster, in the admired argument in the Kinlocks’ cash, which is constantly appealed to by the advocates of the power of the Court, and which, on the present question, I may safely consider as the text of this branch of the law, by first stating what the question is not.
This is not a question, whether, after evidence given, the Court may discharge the jury, where undue practices have been used to keep material witnesses on the part of the prose *591 cution out of the way, or where witnesses have been suddenly taken ill, and unable to give their evidence ; nor is it a question whether it may not be done, where, by some oversight, the prisoner, in a phrenzy, has put himself on his trial; nor where, by the indulgence of the Court, and consent of the prisoner, the trial goes-off, after the jury is sworn and before evidence is given, in order to entitle the prisoner to some advantage in point of defence, which, in the rigour of the law, he would not be entitled to ; nor is it a question whether this may not be done, where the prisoner or a juror is suddenly taken ill, or a juror is intoxicated, or, after he is sworn, disappears ; for all these are exceptions to the rule. What is the nature of these exceptions ? It is either where the discharge is by his consent and for his benefit, or where ill practices have been used, or where he is insane or becomes suddenly ill, so that by the providence of God, he is rendered totally incapable of speaking for himself, or instructing others to speak for him, or where a juror or- witness is suddenly taken ill; these last are cases of positive, absolute, and extreme necessity; visitations of God, which are exceptions to all rules ; or where it is on account of the misbehaviour of a juror, who has absconded, or is incapable to perform the duties of one, by reason of intoxication. These, and a variety of cases, falling within the same reason, will fall within the exceptions; difficult to define, but which' all produce the same effect; the impossibility of proceeding with the trial, with justice to the prisoner, or to the State ; cases under very extraordinary and striking circumstances,-as Judge Story expresses it.
But the present question is, whether, in a case of life, the Court can discharge the jury, after the cause is closed, and jury retired to consider of their verdict, solely because they come into Court and declare they cannot agree, and that there is not the least probability they ever will; not only without the consent, but against the consent of the prisoner-—and this is the general question on which I give an opinion.
The discharge of a jury for this reason, is not one of those unforeseen casualties which could not be defined, and, therefore, could not have been provided for. It is an occurrence which frequently must arise, and, if the Court possesses the. power, there would be no want of precedents, and a principle so very important in the administration of justice, would *592 have been found in every essay on criminal law, and would not? at this day, have depended on the doctrine of undefined necessity, a doctrine abhorrent to the common law, which de- ,. . . . lights m certainty, and leaves as little as possible to the discretion of Judges ; the most dangerous and tremendous of powers; and I do not hazard contradiction when I say, this power never was exercised in England but once, and that with the consent of the prisoner^; and this was Mansell’s Case, in the reign of Elizabeth. 1 And. 103. That case has formed no precedent, and has never been mentioned but to be condemned. In Kinlocks’ Case, Fost. Cr. L. 29, it was decided not to be law by the ten Judges assembled to consider this general power of the Court to discharge jurors in capital eases.
The Judge who dissented, and denied the pow¡ r of the Court in any case, and who considered the rule as universal, to which it was safer to adhere, than on any account to establish a power in the Court which is admitted to have been grossly abused, and might be so again, reprobated the conduct of the Judges in terms of unusual severity. The asking the prisoners’ consent, plainly betrayed a consciousness in the Judges, that the thing was wrong ; and Sir Michael Foster, (p. 31,) says( “ Nor is the present question, whether the bare consent of the prisoner, unassisted by counsel, and consenting to his own prejudice, will render the Court quite blameless in discharging a jury after evidence;” and then proceeds, “ this was done in Mansell’s Case, which hath been cited at the bar, but I think it ought not to have been done; for, notwithstanding what the record saith of the uncertainty and insufficiency of the verdict, the truth of the case was no moie than this; the jury was not agreed on any verdict at all, and, therefore, nothing remained to be done by the Court but to send them back, and keep them together until they had agreed on such verdict as the Court could have received and recorded; and the prisoner ought not to have been drawn into any consent at all, for, in capital cases, the Court is so far of counsel with the prisoner, that it should not suffer him to consent to any thing so manifestly wrong and to his own prejudice.” Here, then, is the opinion of Judge Foster, declaring that, in a capital case, the Court have nothing to do with the jury after they have retired to consider of their verdict, but to keep them together until they have agreed; that *593 to discharge the jury even with the consent of the prisoner, is manifestly wrong, and though he considers that no rule can or will meet all the- variety of cases in.which it may be proper to exercise the power of discharge, yet there is one case in which it is manifestly wrong, and that is to discharge the jury, before they have agreed on their verdict, and even where it is done with the prisoner’s consent. How much greater must be the wrong, when it is done against his consent ? There is a manifest difference between capital cases and mere misdemeanors, and between indictments for misdemeanors punishable with infamous punishment, and those which are in the nature of a civil action, as to the power of the Court to discharge the jury. In The King v. Jeffs, 2 Stra. 984, Lord Hardwicke, though at first inclined to ■ discharge a jury, in barratry,' because the prosecutor wanted the copies of some processes, on consideration, held, that there was a difference between cases which might be compared to cases of a civil nature ; and this, where the punishment may be infamous, as the pillory ■ and, for this reason, it never ivas done in perjury or forgery. Mr. Justice Kent, who delivered the opinion of the Court in The People v. Olcott, has taken a most comprehensive view of the subject and examined all the authorities then extant, with the ability and research which distinguish this very eminent Judge, yet he produces no decision, gives no instance, and would seem to admit, that there is no direct decision to support it in misdemeanors, by concluding that there is no general rule or decision against it. He refers to Doctor Student, an ancient book of approved authority, where the power is laid down in very broad terms, but where the answer of the Student might well apply to civil cases ; for, in capital cases, at that early day, refreshments were never allowed, even by the consent of prisoners. It was left to modern'times to grant this indulgence, first by the consent of the prisoners, and afterwards by the inherent authority of the Court, and that only before the evidence had closed, not after the jurv had retired to consider of their verdict. The Student is pretty liberal in his grant of power to the Court, ‘‘ I think that the Justices may take such order in the matter as may seem to them meet by their discretion, to stand with reason and conscience, by awarding a new inquest, if they will not agree, and by setting a fine on them that they shall find in default, or otherwise.” Who *594 would be judged in default, it is difficult to say. Would the cour(; inquire how they stood, and fine the minority, or would ^ne those who differed from the Judges? Most likely the latter; for improper discharges of juries, and fining them because they refused to give a verdict to please the Court, usually went hand in hand. 1 he truth is, that when this ancient book was composed, the rights of prisoners and privileges of jurors, were little understood. It is, indeed, true, that Hale had adopted, to a great, toan excessive extent, the power of the Court, not only to discharge the jury where the prosecutor was not fully prepared with evidence, but says, it was usual, at the gaol delivery at Newgate, that if a jury be charged with several prisoners, and the Court find, by probable circumstances, that the jury is partial to one of the prisoners, the Court may discharge the jury of that prisoner, and put him on his trial by another jury; this was usual in other circuits. A lamentable instance of the abuse of discretion, and a strong proof of the danger of entrusting this power to Judges, when the great and good Lord Hale fell so far into the fashion of bad times, as to countenance, by his authority, a practice so inconsistent with justice and humanity —undermining the very foundation of trial by jury, the pride and boast ohhuEnglish nation, the palladium of English liberty, and the only security and protection of the subject against the oppression of the Government. It was in the reign of Charles II. when Lord Hale composed his History of the Pleas of the Crown, and when, as Sergeant Hawkins informs us, the rule of Lord Coke, that, in a capital case, a jury sworn and charged, could not be discharged but by consent of the prisoner, was first broke in upon; but the rule, says this very able writer, notwithstanding some authorities to the contrary in that reign, hath been holden for clear law, both in the reign 6f fames II., and since the revolution.
But Judge Kent gives no opinion further than on the case before him ; he decides it on the analogy between the power of the Court in civil cases and misdemeanors. If the question, he observes, in capital cases be doubtful, there is nothing to render it so in misdemeanors. The People v. Denton was before the same Court a few months before, which was an indictmentfor a misdemeanor, and the jury were discharged because they could not agree, and the Court then drew aline of distinction between capital cases and misdemeanors. They *595 ' say, the power of the Court in cases of misdemeanor, as in civil cases, rests in sound discretion, and is to be exercised with great caution. We come now to the case of The Commonwealth v. Bowden, 9 Mass. 494. That was a trial for a robbery, not then a capital offence in that State. The Court and the counsel seem to recognise the same distinction between criminal and capital cases. The Solicitor General observes, there are many instances where juries, in criminal cases, not capital, have been discharged by the inherent authority of the Court, sometimes exercised from the inevitable circumstances of the case ; and the Court rest very much the power of withdrawing a juror, where there was no prospect of a verdict, on a practice frequently being adopted at criminal trials in that Court. The last decision was by the Supreme Court of New Tork in Goodwin!s case ; and that, it must be admitted, approaches very near to the present question. It is true, that the crime alleged was that of manslaughter, not punishable with death, yet it fell within the common law principle, that no person can be twice put in jeopardy of life or limb for the same offence. There, however, existed in that case a circumstance which might have afforded good ground to discharge the jury, the approach of the hour, beyond which the power of the Court could not be prolonged, yet the Court did not decide on that ground alone, but on the general authority. It must, then, be considered as the opinion of a Court, than which none stands higher in the United States, or whose decisions are more respected ; yet I feel a strong conviction, that the construction given to this provision of the Constitution of the United States, engrafted into the Constitutions of Delazuare, Kentucky and Tennessee, and made an article in the bill of rights of this State, is not the true one; and that the provision, that no person can be put twice in jeopardy of life or limb, means something more than that he shall not be twice tried for the same offence. It is borrowed from the common law; and whatever construction it had received in the Courts of the common law, ought to be given to it. It would be idle and unmeaning, if it merely intended to protect the accused against a second trial, for it is a universal principle, not only in every crime, whatever be its grade, but in personal actions, and in all questions of civil right, that a verdict and judgment is a bar to all subsequent proceedings for the same *596 cause, between the same parties or privies. To make that which was so plain and universal a rule, a solemn article in a Constitution ; to introduce it into a bill of rights, declaring that to be one of the general great and essential principles of liberty and free government, unalterably established, which was the law in every, the most insignificant offence, would be without use or meaning, and would impute to the framers of the Constitution, an ignorance of the law, which cannot justly be ascribed to them. This is not the signification' of the words used in their common use, nor in their grammatical or legal sense ; twice put in jeopardy, and twice put on trial, convey to the plainest understanding different ideas. But how is it understood by the law? What is the legal construction ? Foster, the standard authority, in the Kinlocks’ Case, 37, gives his opinion—“ The discharge of the jury was not to bring the prisoners’ lives twice in jeopardy, (which is one great inconvenience in discharging juries in capital cases,) but merely to give them one chance for their lives, which it was apprehended they had lost.” But in the present case, it was not to give them one chance for their lives, but obliging them to take two. One chance they had run for their lives by the first jury. This is the legal meaning, the judicial construction of the words jeopardy of life or member ; that to discharge a jury in a capital case, has one great inconvenience, that of bringing the prisoner’s life twice in jeopardy. Chitty, in his treatise on the criminal law, (1 Chitty C. L. 63,) adopts this as the settled construction. “ Besides these cases,” he observes, “in which juries may be discharged from the casual circumstances of illness, there are some others in which the crown, at least by the consent of the prisoner, is at liberty to withdraw a jury, in order to indict him again, or put off his trial. Thus it is laid down, that to let him into a ground •of defence, which he could not otherwise have taken, before evidence given, the Court may, by consent, discharge the jury. And that circumstance cannot bar any subsequent proceeding; but it does not seem, without consent, the prosecutor has the right to bring the prisoner twice into peril of his Ufe; though the contrary has been formerly holden.” There is a wide difference between a verdict given, and the jeopardy of a verdict. Hazard, peril, danger, jeopardyof a verdict, cannot mean a verdict given. Whenever the jury are charged with a prisoner, where the offence is punishable by death, and *597 the indictment is not defective, he is in jeopardy of his lite» His life is in jeopardy on every question taken by the jury amongst themselves. While they are deliberating whether he shall live or die, can it be said that his life is not in jeopardy? His chance of life fluctuates during their deliberation; but his hopes of life are increased by the knowledge that the jury finds his case one of difficulty. He had heard the Judge inform them, if they doubted they must acquit. When the jury come in, and are asked whether they are agreed on their verdict, this is to him an awful moment. When they say they have not agreed, and they cannot agree, he is entitled to all the benefit of their doubts and difficulties, and to say to the Court, “ I have put myself on trial, for life or death, on these twelve men ; I will not agree to be again put in jeopardy : I will take this chance, sooner than undergo the pain and anxiety of another trial.”
In England, we have seen, the Courts have not this authority. In Pennsylvania, from its first settlement, it has neither been claimed nor exercised, and yet no inconvenience has been experienced. Even in civil cases, it was doubted whether the Court possessed the inherent power. The Legislature vested it in them, and accommodated the oath or affirmation of the jury to this change. They are now sworn or affirmed to give a true verdict according to the evidence, unless dismissed by the Court, or the cause be withdrawn by the parties. How different is the course in capital cases ! Before the jury is sworn, the prisoner is solemnly called, and informed that the good men then called are to pass upon him for his life or death ; and the jury are sworn or affirined well and truly to try, and true deliverance make, between the Commonwealth and the prisoner, whom they have in charge. This affords the strongest evidence of legislative understanding, and of legislative intention to give the Court the power in civil cases by law ; and when it is not given in capital cases, it shews the will of the Legislature, that it was not proper to grant it. For my own part, I would regret to see the Court vested with a power which has so often been abused, and so liable to abuse. In the language of the Constitution, I would desire, that “ the trial by jury shall be as heretofore, and the right thereof remain inviolateIf the Court decide that they possess this discretionary power, it requires not the spirit of a prophet to predict, there will be few verdicts of *598 death. Many highly respectable citizens entertain sincere • religious scruples of the right of man to deprive another of life, whatever may be his crime. These would, without much reluctance, enter into the jury box, knowing they were not to be kept together until they agreed on a verdict, but have only not to agree to that which their consciences forbid, and which they believed was against the divine law. There are others, not professing religious scruples, yet possessing a great tenderness in case of life, who would lay hold of the expedient offered by the law to avoid the performance of a duty so painful to all. These would only have to hang out for a time, more or less, as the Court pleased, and experiment after experiment, be made on the lives of men. The law wisely forbids this. There would be little communication or reasoning among the jurors ; slight attempts to convince each other ; and few changes of opinion after they had retired to their room. It has frequently occurred that jurors have come again and again to the bar, declaring, as here, they had not, nor never would agree; yet, on the Court’s firmly informing them that they could not discharge them, have retired, and returned to the bar with a satisfactory verdict. One great objection to this undefined necessity, is, that the Court who discharge, are the sole arbiters of its existence. It is not the subject of revision by any other tribunal; for, as was observed in Olcott’s case, “ the moment cases of necessity are admitted, that moment a door is opened to judge of necessity, and determine what combination of circumstances will amount to one.” The positive, absolute, and extreme cases, forming the exceptions to the general rule, the circumstances and casualties shewing the impossibility of proceeding in the trial, are capable of proof; but the distant, imaginary, and possible contingencies that may arise, to the health of the jurors, by keeping them together, are matters of mere conjecture. It is said, is a juror to be compelled by hunger to give a verdict contrary to his judgment ? Such an extreme case has never occurred. When an extreme case does occur, it will be time enough for the Court to decide on it. This record states no allegation of any juror being affected in his health, or ready to perish by hunger; but the jury was discharged solely on their declaration, that they could not agree, and that there was not the least probability they ever would. I am of opinion, therefore, that the Court had not authority to discharge the jury, *599 for this reason, without and against the consent of the prisoners; and that this discharge amounted to an acquittal. I give no opinion as to the authority of the Court in misdemeanors. ,
When I speak of the abuse of this power, I am far, very far, from supposing that the Court intended to oppress the prisoners. They had the general reasoning-of Judges, distinguished for their profound knowledge, and the sanction of the recent decision of the Supreme Court of New York, in the case of Goodwin, to support the discharge of the jury in this case.
Prisoners discharged.