## ATKINS vs. THE STATE.

A plea to an indictment for murder, that the defendant had once before been put in jeopardy of his life for said offence in said indictment, without showing how or in what manner he had been put in jeopardy of his life, is bad on demurrer.

And where such plea sets up that the defendant was before in jeopardy, upon another and different indictment, for the same offence, it must also set out the record of the former indictment: propose to verify the same by the record ; and allege the identity of the defendant in said plea to be the same as the one heretofore supposed to have been put in jeopardy of his life.

It is a matter within the sound discretion of the Circuit Judge, who is cognizant of all the circumstances, whether the jury ought to be discharged on account of the sickness of one of the panel; and this court will not control that discretion, unless it affirmatively appear of record that it was exercised to the detriment of the prisoner.

A person who is "opposed to capital punishments," is not, therefor, incompetent and disqualified as a juror: and it is error in the court to reject one of the original venire for such cause.

Where threats, on a trial for murder, are proved to have been made by the defendant against the deceased, the defendant should be permitted to enquire of the witness as to any irritating or provoking remarks, made at the time by the deceased, inducing the threats.

A witness, in a criminal case, cannot be interrogated as to his statements made before the examining court, unless such statements be different from the evidence given on the trial: then he may be interrogated as to such statements with the view of contradicting him.

A defendant on a trial for murder, has no right to read in evidence to the jury, the statement made by him and reduced to writing before the examining court.

Evidence of threats made by the deceased, against the prisoner, are inadmissible in his defence, unless there be proof that they were communicated to him before the homicide.

Where a witness makes a statement on the trial, differing from that made by him before the examining magistrate, and such testimony was reduced to writing, it should be produced for the purpose of contradicting him, or sufficient ground laid for the introduction of secondary evidence.

It is not allowable on cross-examination to put questions to a witness, not relating to the matter in issue, for the purpose of contradicting him by other witnesses: but such questions may be put to him for the purpose of trying his credibility—in such case, the cross-examining party must be satisfied with his answer.

It is not necessary that the verdict in a criminal cause should be written on the indictment, though it is usual to do so; nor that it should be returned in writing at all.

It is error in the court to permit the traverse jury, when retiring, to take with them, for any purpose, a record containing the evidence given before the committing magistrate, not offered in evidence on the trial, though the court instruct the jury "that they must not read said record."

The fact that the prisoner went to the house of the deceased "for the purpose of having a difficulty with him," and in that difficulty killed him, with a deadly weapon, would not, regardless of all other circumstances attending the difficulty, make the homicide a murder.

Where two parties propose and accept a combat, without previous malice, and one kills the other with a deadly weapon, he is at least guilty of manslaughter.

If one party asks another to strike him, intending to use a deadly weapon, and upon being struck by the other with his fist or hand, kills him with such deadly weapon, he is guilty of murder.

If one assail another with insulting words and blows, and without the use of any weapon, and the assailed party, without attempting to evade the fight, kill the other with a deadly weapon, he is guilty of manslaughter.

Instructions should not assume that the facts upon which they are based were proven; but should be so framed as to leave the jury to determine whether or not they were proven.

*Appeal from Union Circuit Court.*

Hon. THOMAS HUBBARD, Circuit Judge.

WATKINS & GALLAGHER, for the appellant.    1. The court should

37B

have sustained Atkins' motion to be discharged, for the court discharged the jury without absolute or inevitable necessity. 3 *Phill. on Ev.* 953, *and cases there cited;* *Commonwealth vs. Coove,* 6 *Serg. & Rawle* 577 *;* 10 *Yerger* 536 *; Stewart vs. State,* 13 *Ark.* 747 *; Bevens vs. State,* 6 *Eng.* 455.

2. The court erred in setting aside for cause the jurors on account of being merely opposed to capital punishment, contrary to statutory and common law. *Secs.* 158, 161, *chap.* 52, *Digest;* *Wheaton's Am. Crim. Law* 856, *and authorities cited;* 17 *Serg. & Rawle* 164 *; People vs. Brodine,* 1 *Denio* 317*;* 24 *Wend.* 549 *;* 4 *ib.* 240.

3. Court erred in refusing Carroll to testify the whole of the conversation that led to Atkins' threats. *Whart. Am. Crim. Law* 884, *p.* 287, *and cases there cited.*

4. Court erred in refusing to allow Atkins' testimony or statements before examining court to be read. *Digest, chap.* 52, *sec.* 33, *p.* 392.

5. The court erred in refusing to allow the witness to refresh his memory by reference to his former written depositions. 1 *Greenl. on Ev.,* sec. 436, *note* 3.

6. The court allowed jury to take papers away with them, not in evidence in the cause, but relating thereto. *Whart. Am. Cr. Law, p.* 901, *and authorities there cited.*

7. That the court erred in the instructions given, see *State vs. Yoes,* 4 *Eng.* 243 *; Bevins vs. State,* 6 *Eng.* 460 *; Wharton's Am. Crim. Law* 362, 369, 372, *and authorities.*

Mr. Attorney General JORDAN, contra. The court below did not err in overruling the motion: because, the only method by which that question could be raised, was by plea. *Brown vs. Peevey,* 1 *Eng.* 36 *; ib.* 196 *; Houston vs. Moore,* 5 *Wheat.* 3 *; Serg. Const. Law* 278 *; Moore vs. State, Walker Miss. Rep.* 139 *;* 1 *Russell on Crimes* 837, *note* 1.

The plea setting up the same matter, is objectionable, because it sets up matter of law. As to such pleas, see 6 *Serg. & Rawle* 588 *;* 10 *Yerger* 537 *;* 2 *John. Cases* 275.

As to challenges of jurors, see 13 *Ark.* 147 ; *Digest* 412 ; *Wharton Crim. Law* 856 ; 17 *Serg. & R.* 155.

As to reading the examination of the prisoner, before the examining court: *Roscoe's Crim. Ev.* 60, 61, 64, 65 ; 1 *Haywood Rep.* 112 ; 3 *Hill N. C. Rep.* 291.

As to a witness refreshing his memory : 1 *Greenleaf's Ev.*, sec. 436.

Though the court may have erred in the instructions, yet if the verdict be right on the whole recored, it should be sustained. 14 *Ark.* 420 ; 4 *Eng.* 213 ; 6 *Eng.* 764.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

At the April term of the Columbia Circuit Court, 1853, Robert W. Atkins was indicted for the murder of Thomas Wicker. The venue was afterwards changed to the Union Circuit Court, where the defendant was tried, convicted of manslaughter, sentenced to the Penitentiary for three years and one month, and appealed to this court.

The questions of law reserved for the decision of this court, will be taken up in the order in which they are presented of record, and have been argued by counsel.

1. At the term at which the indictment was found, the defendant was arraigned, pleaded not guilty, and the cause was continued. During the first week of the next October term of the Columbia Circuit Court, (1853,) steps appear to have been taken to empannel a jury for the trial of the cause, but the requisite number seem not to have been obtained until Saturday of the first week of the term, when the panel was completed, and the jury sworn.

On Monday of the second week of the term, it seems that the trial commenced, a witness was examined on the part of the State, an objection by the defendant to the proof of the dying declarations of the deceased, overruled by the court, and exceptions taken.

Then follows a record entry in these words : "During the ex-

amination of said Wicker, (the witness above referred to) and pending the trial, James Gault, one of the jurors to try this cause, was reported to be sick—whereupon, the court took a recess until one o'clock, P. M.

Dr. A. J. Smith, a regular, practicing physician, being called in to see the said James Gault, the juror aforesaid, reported to the court that he considered said Gault wholly unable to sit as a juror to-day, and in the event said juror might soon recover, his sitting as a juror would produce a relapse—therefore, the court discharged the jury without day."

Thereupon, it appears, the defendant filed a motion to be discharged, on the ground that he had been regularly put upon his trial before a jury duly empannelled, and the jury discharged pending the trial, without his consent, which motion the court overruled.

The prosecuting attorney then moved for a *venire de novo*, and that the court proceed to try the cause at that term, but the court overruled the motion, and continued the case.

At the next term, the cause was continued on the motion of the defendant.

At the October term, 1854, the defendant filed the following plea :

"And now on this day, comes the said Robert Atkins, in his own proper person, and for a further plea in this behalf, by leave of the court, &c., says that the said State ought to be barred in this behalf, and ought not further to prosecute her said indictment against him, because he says that he has once, before this time, been put in jeopardy of his life for said offence upon said indictment, in said Circuit Court of Columbia county aforesaid, at the term thereof, begun and held in and for said county of Columbia, on the third Monday after the fourth Monday in September, in the year 1853, at, to wit : in the said county of Columbia, said court being then and there a court of general jurisdiction, and having then and there full and complete jurisdiction of the issue specified and mentioned in said indictment,

and of the person of the said Robert H. Atkins, at, to wit: in the county of Columbia, which he, the said Robert H. Atkins, is ready to verify—whereupon, he prays judgment," &c.

To which plea the State demurred on the following grounds:

1. "Said plea does not show how, or in what manner the said defendant has been put in jeopardy of his life.

2. It does not set out the record of the former indictment.

3. It does not propose to verify the same by the record.

4. It does not allege the identity of the defendant, in said plea, to be the same as the one heretofore supposed to have been put in jeopardy of his life," &c.

The court sustained the demurrer.

Was the demurrer to the plea properly sustained? If so, should the court have discharged the defendant upon the motion first made by him?

The substance of the plea is, that the defendant had once before been put in jeopardy of his life for said offence upon said indictment, in said Circuit Court, &c.

This was pleading a mere conclusion of law, and not issuable facts. It may be supposed that the matter of jeopardy, designed to be set up by the plea, was the discharge of the jury after the cause had been submitted to them, at a previous term. But it was not proper for the plea to leave the court to inference. If the defendant thought proper to present the matter by plea, he should have alleged the facts, so that the State could have taken issue to them, or admitted them to be true, by demurrer, and submitted to the court their sufficiency in law to entitle him to a discharge from further prosecution.

The plea of former acquittal consists of matter of record and matter of fact—of record, the indictment and acquittal: of fact, that the defendant is the same person, and that the offence is the same. *United States vs. Shoemaker*, 2 *McLean's Rep.* 120; 1 *Chitty's Crim. Law* 459.

A man who has stood upon his defence on a valid indictment, before a legal jury, which has been discharged without good

cause, has incurred the first peril, and shall not incur the second by a subsequent trial. A modification of the usual plea of *auterfoits acquit* must be the consequence of establishing this doctrine, so as to adapt the plea to the facts : or if the plea remain unaltered, the rules of evidence must so far yield as to allow an averment of an acquittal by a verdict, to be proved by a record showing a virtual acquittal by the unnecessary discharge of a jury without a verdict. *Weinzorpflin vs. The State,* 7 *Blackf. Rep.* 192; *United States vs. Shoemaker ub. sup; The People vs. Barnett et al.,* 1 *John. Rep.* 66; *Commonwealth vs. Cook et al.,* 6 *Serg. & Rawle* 577.

The first objection taken to the plea, upon demurrer, that it did not show how, or in what manner the defendant had been put in jeopardy of his life, was, therefore, well taken.

Had the plea intended to set up that the defendant was before in jeopardy, upon another and different indictment for the same offence, the other objections taken upon demurrer would have been good.

But the plea being to the same indictment upon which the defendant had been previously arraigned and put upon his trial, it was not necessary for him to set out the indictment to which he was still pleading, for the whole record was before the court. The allegation, that the defendant had once before been put in jeopardy of his life for said offence, upon said indictment, would have been sufficient, had the plea gone further and alleged the facts relied on as constituting the jeopardy.

Should the defendant have been discharged upon his motion? It was objected by the Attorney General, that the defendant could only raise the question of his right to discharge by plea, and not by motion.

This objection is not well taken in this case. The defendant moved for his discharge immediately after the court discharged the jury. The facts were all known to the court, and put upon its record. It was the action of the court, in progress of the trial, that the defendant complained of, and the court being perfectly

cognizant of its own proceedings in the premises, no plea was necessary to enable it to determine the legal effect of discharging the jury, under the circumstances. The facts being upon record, the question of the right of the defendant to be discharged from further prosecution, could be raised by motion or in arrest of judgment. Such has been the practice, as will appear from the following cases. *Nugent vs. The State*, 4 *Stewart & Port.* 72; *State vs. Garrigues*, 1 *Haywood* 241; *United States vs. Perez*, 9 *Wheaton* 579; *The State ex. rel. Battle*, 7 *Ala. Rep.* 259; *The People vs. Barrett & Ward*, 2 *Caines' Cases* 305; *The People vs. Olcott*, 2 *Johnson's Cases* 301; *The People vs. Goodwin*, 18 *J. R.* 187.

The question recurs, should the defendant have been discharged upon the merits of the motion? The facts stated of record in reference to the cause of the discharge of the jury, must be taken as true, as the defendant did not propose, by bill of exceptions, to put upon record any additional or different facts.

The 12th section of our Bill of Rights declares: "That no person shall, for the same offence, be twice put in jeopardy of life or limb."

A similar clause is contained in the 5th Article of the Amendments to the Constitution of the United States, and in, perhaps, all of the American Bills of Rights. It was likewise a provision of the common law.

Lord Coke seems to have been of the opinion that a jury charged in a capital case, could not be discharged without giving a verdict, even with the consent of the prisoner and the attorney general. 1 *Inst.* 227 *b*; 3 *Inst.* 110. But the doctrine was fully discussed in the case of the *Kinlocks*, *Foster* 22, and the law settled to be that where the jury is discharged by the consent, and for the benefit of the prisoner, he cannot avail himself of such discharge as ground to be released from further prosecution.

In *The King vs. Edwards*, 4 *Taunt.* 309, whilst the prosecutor was giving his evidence, one of the jurors fell down in a fit, and was pronounced by a physician on oath, incapable of proceeding in his

duty as a juryman on that day: whereupon, the jury was discharged, a new jury sworn and the prisoner convicted. The point argued before all the judges of England, (except MANSFIELD and LAWRENCE,) was, whether the prisoner could be tried after the discharge of the jury without his consent. The judges held that it was the settled law that he could, and gave judgment against the prisoner. Such, too, was the decision in *Ann Scalbert's case*, 2 *Leach C. C.* 706. In *The King vs. Stevenson, ib.* 618, the prisoner fell down in a fit, during the trial, and the jury was discharged, and upon his recovering, he was tried, and convicted by another jury. *Nugent vs. The State, 4 Stew. & Port.* 78 ; 1 *J. R.* 204.

Mr. CHITTY says (1 *Crim. Law* 629,) if one of the jurymen be taken ill during the trial, though of a capital offence, so as to be incapable of agreeing in the verdict, or die, the jury must be discharged, though the evidence of the crown is nearly gone through, and the prisoner may be tried afresh by another jury. * * * And if the prisoner himself be taken so ill during the trial, that he is incapable of remaining at the bar, the investigation must be suspended ; and when he afterwards recovers, another jury must be returned to decide on the merits of the accusation. In some cases, indeed, where a juryman has taken ill, the judge, instead of discharging the jury, has asked the prisoner's consent to swear another juror in the room of him, who was removed by indisposition, but the better practice seems to be that of discharging the jury altogether, and returning another, competent to determine the issue.

Nor are we without American adjudications on this point.

In the case of *Nugent vs. The State, 4 Stew. & P.* 72, the prisoner was arraigned for murder, pleaded not guilty, a jury was empanneled and sworn to try the issue, and the court adjourned until the next day. The record then recited that on the next day the presiding judge was so extremely indisposed as to render it impossible for him to preside ; and it was, therefore, ordered that the jury be discharged. At the ensuing term, the

prisoner was again put upon his trial, and a verdict of manslaughter against him. When called to the bar for sentence, his counsel moved for his discharge, on the ground of the discharge of the first jury, but the court overruled the motion, reserving the question for the decision of the Supreme Court. The Supreme Court, after reviewing the leading English and American decisions on the subject, held that the prisoner was not entitled to a discharge. The general rule is recognized to be, that where a jury has been sworn, and the prisoner put upon his trial, they cannot be discharged until they render a verdict without his consent, and if they are so discharged, he cannot be put upon his trial again: but the court, also, held that the ends of public justice admitted of exceptions to the rule, based upon urgent necessity.

So it has been held that the expiration of the term of a court, operates *ipso facto*, to discharge a jury deliberating upon a capital case : and such discharge will not bar a second trial. *Lore vs. The State*, 4 *Ala. Rep.* 173; *Ned vs. The State*, 7 *Porter* 187.

In *The People vs. Olcott*, 2 *Johnson's Cases* 301, the power of a court to discharge a jury, in a criminal case, before they render a verdict, without the consent of the prisoner, and the effect of such discharge, were elaborately examined by Mr. Justice KENT. The rule was conceded to be more rigid in capital cases and felonies, than in misdemeanors, but the judge remarks that all the authorities admit that when a juror becomes mentally disabled by sickness, &c., the court possesses the power, to be exercised with sound discretion, and based upon necessity, of discharging the jury. See, also, *The People vs. Goodwin*, 18 *John. Rep.* 187, where the subject was discussed by Chief Justice SPENCER : also, *People vs. Barrett & Ward*, 2 *Caine's Cases*, 304. In these cases, as well as in *Commonwealth vs. Cook et al.*, 6 *Serg. & Rawle*, 577; *Commonwealth vs. Clue*, 3 *Rawle* 501; *Ned vs. The State*, 7 *Porter* 187; *State vs. Job Garrigues*, 1 *Haywood*, 241; *United States vs. Perez*, 9 *Whart. Rep.* 579, and other cases cited in these cases, the power of the court to discharge a jury because of their being unable to agree, without the consent of the prisoner, is dis-

cussed, and there is some conflict between them, but it is generally conceded that where the court is under the clear necessity of discharging a jury in consequence of the sickness of one of them, the prisoner may be put upon his trial again in capital cases.

In *The United States vs. Perez, ubi sup.* (9 *Wheat.* 579,) Judge STORY, delivering the opinion of the Supreme Court of the United States, said: "We think that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life in favor of the prisoner. But, after all, they have the right to order the discharge, and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oath."

In *The United States vs. Shoemaker,* 2 *McLean's Rep.* 117, the court said: "Where the judgment is arrested for some defect in the indictment, it is admitted that the defendant may be prosecuted a second time for the same offence. And that a discharge of the jury by the court, under sudden emergency, constitutes no bar to another trial. In the first case, the defendant could not be said to have been in jeopardy, as the indictment was radically defective; and, in the second case, from the sudden indisposition of a witness, a juror, the court, or an irreconcilable difference of opinion among jurors, having occurred, over which neither the court nor the parties could exercise any control, the discharge of the jury became indispensable. The trial could not

proceed : no verdict could be rendered—and, for this reason, the defendant, in such a case, was not considered in jeopardy. The fault was not with the prosecuting attorney, nor with the defendant, and the circumstance was so imperious as to lead to a failure of public justice, unless the court should discharge the jury."

It is insisted by the counsel for the prisoner, in this case, that the juror having taken ill on Monday, and the court having the remainder of the week to sit, it should have waited to see if the juror would not recover from his illness in time to conclude the trial, and that the court had no right to discharge him at once, as it did. We think the matter rested in the sound discretion of the circuit judge, who was upon the spot, heard the statement of the physician, and was cognizant of all the surrounding circumstances, and unless it affirmatively appeared of record that this discretion was abused to the detriment of the prisoner, we would not feel warranted in saying that the jury was improperly and illegally discharged, and that the motion of the prisoner to be discharged from further prosecution, should have been sustained. The cases, however, cited above, abundantly show, that the power of the court to discharge the jury is a delicate one, based upon necessity, and should not be exercised except in cases of manifest and urgent necessity, and if the jury are improperly discharged, in a criminal case, after the issue is submitted to them, the accused cannot be put upon his trial again for the same offence. See *Powell vs. State*, 19 *Ala.* 581.

The remaining points reserved were made grounds of a motion for a new trial, which the court overruled, and the prisoner excepted, setting out the evidence, &c.

2. It appears that a *venire facias* was issued for thirty-eight jurors, and a list of the persons summoned duly served upon the prisoner. When the jurors were called to the bar for the purpose of making up the jury, it seems that the court propounded the following interrogatories to four of the regular panel: "Do you entertain any opinion, which would preclude you from finding a prisoner guilty, where the punishment is death, if the evidence

would justify the verdict, *or in other words, are you opposed* *capital punishment ?*"    And they severally answered "that they were opposed to capital punishment."

Whereupon, the counsel for the prisoner moved the court to limit the enquiry, and ask the jurors the questions in these or similar words : "Are your opinions such as to preclude you from finding any defendant guilty of an offence punishable with death ?"

Which motion the court overruled, and decided that if a juror answered that "*he was opposed to capital punishment*, he was incompetent and disqualified as a juror, and the defendant excepted.

The 158*th* sec., *chap.* 52, *Dig.*, declares that "persons whose opinions are such as to preclude them from finding any defendant guilty of any offence punishable with death, shall not be allowed or compelled to serve as jurors on the trial of an indictment for any offence punishable with death."

The court surely erred in rejecting the jurors, because they were opposed to capital punishment, unless they had gone further and brought themselves within the disqualification prescribed by the statute.

Whatever may be a man's views of capital punishment as a question of policy, the jury box is not a proper place for him to consider such policy. There he is obliged, by his oath, to try the guilt or innocence of the accused, according to law and evidence, and not to set up his own private opinion against the policy of the law, which he is bound, as a good citizen, to abide by and administer, so long as it is in force, and until it is repealed by the constituted authority.    See the authorities collected on this subject in *Wharton's Crim. Law* 857, 858.

It appears that there were only six jurors obtained from the original names returned upon the *venire*, and the remainder of the panel was made up from talesmen.

In capital cases, the defendant is entitled to a list of the jurors summoned, at least forty-eight hours before the trial.    *Dig., chap.* 52, *sec.* 154.    This affords the prisoner and his counsel an opportu-

nity of enquiring into the characters and dispositions of the venire men, and of selecting such as they may think will give him a fair and impartial trial. It is an important right, and should not be impaired by any irregular action of the court. See *Stewart vs. The State*, 13 *Ark. Rep.* 720. It is impaired to the extent that the court may erroneously reject, as incompetent, persons returned upon the original list, which has been furnished the prisoner, and put him upon talesmen to make up the jury.

It appears, also, from the bill of exceptions, that the court rejected a person summoned as a talesman, because he said he was opposed to capital punishment. But this could not be supposed to have prejudiced the prisoner.

3. Carroll, a witness for the State, testified that he had heard some slighty remarks from Atkins about Wicker. Atkins said that Wicker had been talking about him, and if he did not quit talking about him and let him alone, he would put Wicker where the dogs could not find him. This was said near Wicker. There was a wedding at Wicker's at the time.

On *cross-examination*, the witness stated that Atkins, and a part of his family, were at the wedding at Wicker's.

Defendant then asked the witness: "what circumstances, or what Wicker had said about Atkins that led to the remark of Atkins about putting Wicker where the dogs could not find him?"

The question was objected to by the State, and ruled out by the court, and defendant excepted.

The object of the State in proving the declarations of the prisoner, against the deceased, at the wedding, was doubtless to show malice. If these declarations fell from the prisoner, in consequence of any irritating or provoking remarks, the witness should have been permitted to state that fact to the jury. The jury might have attached more or less consequence to the threats made by the prisoner, on a full understanding of the circumstances under which they were made. It was their province to determine whether the declarations of the prisoner made upon the

occasion, were indicative of permanent and settled malice toward the deceased, or merely a temporary ebullition of feeling arising upon the provocation of the moment. While it is the province of the court to exercise a sound discretion in the exclusion of irrelevant matter, it is safest to let in any competent testimony that may tend to throw light upon the motives of the accused in making such declarations.

4. The defendant asked the same witness, Carroll, if he had not testified before the examining court in this case, that he regarded Atkins' threats, made at the wedding, as of no importance or consequence? Which, upon the objection of the State, was ruled out by the court as incompetent.

This question was properly ruled out by the court, there being no proper foundation laid for it.

The defendant had the right to enquire of the witness as to the manner or temper in which the prisoner made the declarations referred to, for the purpose of letting the jury understand whether they were serious and deliberate : and if his response had differed from his statement before the examining court, the prisoner then might have interrogated the witness as to such statement, with the view of contradicting him.

5. After the State had closed her examination in chief, the defendant offered to read in evidence to the jury, the statement made by him, and reduced to writing, before the examining court : which, upon the objection of the attorney for the State, the court excluded, and the defendant excepted.

*Section* 33, *chap.* 52, *Digest, p.* 392, provides that "after the examination of the complainant and the witnesses on the part of the prosecution, the magistrate shall proceed to take the examination of the prisoner, without oath, in relation to the offence charged ; but, before it is commenced, he shall distinctly inform the prisoner of the charges made against him, and that he is at liberty to refuse to answer any question put to him, and shall allow the prisoner reasonable time to advise with his counsel, if he has any in attendance at such examination."

*Section* 34, provides that "none of the witnesses for or against the prisoner shall be present at his examination."

*Section* 35, that "the answers of the prisoner on his examination shall be reduced to writing by the magistrate, or under his direction. Such answers shall be read to the prisoner, who may correct or add to them; and, when made conformable to what he declares to be the truth, shall be certified and signed by the magistrate."

*Section* 47, requires the magistrate to deliver such examination, with the statements of witnesses, to the clerk of the Circuit Court, where the offence is cognizable, on or before the next term thereof, except where the prisoner is committed, and then they are to accompany the warrant of commitment, and be delivered to the jailor.

These provisions of the statute were perhaps designed to afford the prisoner an opportunity of making a free and voluntary confession of the crime charged against him, if he desired so to do. But whatever may have been the intention of such enactments, the right of the prisoner to read the statement made by him before the committing magistrate, upon his trial, in his own favor, is not supported by reason or authority. It would be but to permit him to manufacture testimony for himself, and in many cases, doubtless, would insure his acquittal, if received with credit.

6. The defendant offered to read in evidence the testimony of Richard Harvey, taken in his behalf, before the examing court, the witness being dead. The court on the objection of the State, excluded so much of the deposition of Harvey as related to threats made by the deceased against the prisoner, and he excepted.

On looking into the statement of Harvey which is set out in the bill of exceptions, it appears that he testified before the examining court, as follows:

"I heard Wicker, the deceased, say that he had his knife ground for Atkins. He then asked if Atkins did not have some hogs at Jackson Wicker's. I replied, I did not know, and he said he had his knife whetted or scoured, but which I do not recollect.    *    *

Wicker had a decanter of whiskey, and asked me to drink. I then told him that my business was to make up a school. He asked me if Atkins was going to send to school? I replied, I did not know. It was then that Wicker said : 'I have my knife ground for Atkins.' Wicker said he believed Atkins was a *Murrell* man. This was some four or five days before Wicker was killed, or it might have been a week. This conversation occurred at Russell's old mill." *Cross-examined by the State.* "Walker came to the mill with me. When we got to the mill, we found Cook and Thomas Wicker, and several other gentlemen, I did not know. I never had seen Wicker before to know him. Wicker asked me and the other gentlemen to drink. I do not know whether the conversation about the knife was before or after we took the drink. I do not recollect whether any one else was present at the time when we had the conversation or not. I never informed Atkins of this conversation."

It will be observed, that the conversation in which these threats were made, (if deemed such) occurred between the deceased and the witness. That he could not state that any one else was present when the conversation took place, and that he never communicated the threats to the prisoner.

In *Powell vs. The State*, 19 *Ala. Rep.* 577, Mr. Justice COLE-MAN, delivering the opinion of the court, said : " We think the court properly excluded the threat of Porter, and his declaration concerning the field, as stated in the bill of exceptions. It appears that the admission of threats, &c., as proof, was objected to unless the defendants would prove that information thereof was communicated to them before the killing, which the prisoners failed to prove. The threats, if made known to the prisoner, would have been competent testimony, as tending to show, that in the assault on the deceased, he may have acted under a just fear of danger to his own life, but we cannot see in this case how they could be considered as proof pertinent to the issue. The eminent counsel for the prisoner have failed to produce any authority for the admission of such proof. They insist that it ought to have

been permitted to the jury to infer from the circumstances that the prisoner had knowledge of the threat. No circumstances, from which such an inference might be drawn, are disclosed by the bill of exceptions, and if such existed, it was obligatory on the defence to show them affirmatively. We will not undertake to say that no case could occur, in which such threats, although unknown to the prisoner, might be admissible, but we think there is nothing in this case to authorize their admission."

In *Hudgins vs. The State of Georgia*, 2 *Kelly Rep.* 181, LUMP-KIN, Judge, said: "Was the judge below right in ruling out the evidence of Anderson Hudgins, who testified that he said to the prisoner: 'Yonder comes John Anderson, (the deceased,) and *he will kill you.*'

The witness was permitted to state that he notified the defendant that the deceased was approaching, and it was only his opinion as to the *quo animo* or intention for which he was advancing: that was adjudged to be inadmissible. The doctrine on this subject is this: where the question is, whether the party acted prudently, wisely, or in good faith, the *information* on which he acted, whether true or false, is original and material evidence. And that portion of the proof which was received, comes strictly within the rule, but the part excluded was the *opinion* only of the witness. "To justify a homicide, the defendant must depend upon the circumstances by which he was at the time surrounded, and under the influence of which he perpetrated the act. Were they sufficient to excite the fears of a reasonable man? And is it evident that the slayer acted under the influence of these fears, and not in the spirit of revenge? Was the danger so urgent and pressing, at the time of the killing, that, in order to save his own life, the killing of Anderson was absolutely necessary? Does it appear, also, that the person killed was the assailant?

"Now all these pregnant inquiries must be solved by the facts which transpired, and not by the opinion of a by-stander, whether that opinion was communicated to the accused or not.

"Had young Hudgins informed his father that Anderson was
38B

advancing in great haste, apparently much enraged, that he was using threats of personal violence, armed with a weapon, and the like, all this would be admissible to satisfy the jury that the homicide was in self defence. The *opinion* of the witness is a very different thing. It would be dangerous, in the extreme, to permit the belief of any one, whether sincere or feigned, much more the offspring of the accused, to afford a pretext for taking human life."

See, on the same subject, *State vs. Goodrich*, 19 *Vermont* 117.

The court below did not err in excluding the deposition of Richard Harvy.

7. The defendant proposed to prove by the witness Morehead, that Wicker, the deceased, had threatened Atkins, without offering to prove that Atkins ever heard it. Objected to by the State, and overruled by the court as incompetent. In this, the court did not err.

8. On the examination in chief, Tilford Powell, a witness for the State, testified, in substance, that he was at the house of the deceased on the evening he was killed. That a little after dark, some gentleman came to Wicker's and hallooed, "halloo!" Wicker went out, and asked what he wanted? He said he wanted to talk to him, and Wicker said he would be G-d-d if he could not talk to any one. Witness heard them talking, but could not tell what they were saying, Wicker having gone to the fence. Witness went out to the fence, and Atkins said he wanted Wicker to go out to the wagon and see the marks of some hogs, "you have been accusing me of killing hogs, and you are a G-d-d liar, and a G-d-d rascal." Wicker then replied, " you have, and I can prove it." They then cursed and used short words, and Atkins challenged him to fight him. Wicker at first did not appear to want to go, but soon started out and opened the gate, but witness pulled him back. Then he saw Atkins about that time pull out of his pocket a knife, as he thought, and open it. A son of the deceased then came out, walked through the gate, and asked Atkins what was the matter; and he said, not much, only your father has been

talking something about some hogs, and made very light of it. Wicker then spoke to Atkins, and told him to come up to the fence, that he wanted to get a lick at him, and he would knock him down. Atkins went up to the fence, held out his head, and told Wicker to strike, and Wicker struck him, and knocked him down. Atkins arose immediately and struck over the fence—witness thought with a knife—he struck but one lick. Witness went to Wicker, and asked him if he was cut, and he said he was.

The remaining testimony of this witness, and that of others, conduces to show that Wicker was stabbed with a knife, and died shortly afterwards of the wound.

On *cross-examination*, witness Powell stated, "that he did not know who the person was who called at the fence. Does not believe that he stated on the former trial of this cause, that he knew the man, who called at the fence, by his voice. Did say on said trial, that Atkins called in a friendly manner."

Hobson, a witness for the prisoner, stated that he was present before the examining court, and at the former trial in the Columbia Circuit Court, and that Powell testified in behalf of the State, on both trials, "that we did know the voice of Atkins, when he called at the fence of Wicker on the night of the death of Wicker, and that it was Atkins, and in a friendly voice."

On the motion of the State, this testimony was excluded as incompetent, and the prisoner excepted.

The object of Hobson's testimony seems to have been to discredit Powell, by showing that he had made contradictory statements. The precise point of contradiction appears to be this: Powell seems to have stated, on his cross-examination by the prisoner, on the final trial, that when Atkins first called at the fence of Wicker, he did not know the voice; and that he did not believe that he had stated on the former trial that he knew the voice to be that of Atkins. Hobson testified, that Powell had stated on the former trials, that he knew the voice of Atkins.

It could not be very material to the issue, whether Powell knew

the voice of Atkins, when he first hallooed at the fence of Wicker or not. It seems that he afterwards went to the fence, and found Atkins there altercating with Wicker. The presence of Atkins, and the purpose for which he came, as indicated by what he said and did, and the character of the difficulty that ensued between him and Wicker, were the material matters to be considered by the jury.

It may be remarked that if Powell made a statement upon the final trial, differing from that made by him before the examining magistrate, and his testimony before the examining court was reduced to writing, it should have been produced for the purpose of contradicting him, as it would be the best evidence for that purpose. The prisoner could not introduce secondary evidence, without showing that it was not in his power to produce the statement of the witness as reduced to writing by the magistrate. *Roscoe's Crim. Ev.* 236.

As to the testimony of Powell, on the former trial in the Columbia Circuit Court, the rule is that although it is not allowable on cross-examination to put questions to a witness not relating to the matter in issue, for the purpose, if he answers them against the cross-examining party, of contradicting him by other witnesses, yet it is a well settled rule that questions not relevant may be put to a witness for the purpose of trying his credibility, but in such case the party cross-examining must be satisfied with his answer. *Roscoe's Crim. Ev.* 181, 182.

Had it been a question before the jury, whether in point of fact it was Atkins who hallooed at the gate, or some one else, then the statement of Powell, that he knew or did not know the voice, would have been material to the issue; but the witness going to the gate, and finding Atkins there, put aside any question as to the identity of the voice, and the only matter was, whether the witness did or did not recognize the voice when he first heard it, which could not have been material to the issue.

The manner and tone of the voice of Atkins, when he first came up and hallooed, might have been material for the purpose of

showing the temper of mind he was in, but as to this, it does not appear that the witness made contradictory statements.

We cannot conclude, therefore, that the court committed any error, prejudicial to the prisoner, in excluding the testimony of Hobson.

9th. The defendant proposed to prove by the witness Franks, that he saw the prisoner's head the next day after the death of Wicker, and that there was a deep cut in his head, and that the witness examined the wound, which the court excluded upon the objection of the State, and the defendant excepted.

It seems to have been a matter of controversy on the trial, whether Wicker struck the prisoner with his fist, when he put his head over the fence, or had something in his hand.

We think it is very clear that the proposed proof, that there was found a deep cut or wound upon the prisoner's head, on the next day, was material and relevant to the issue, and should have gone to the jury for what it was worth. We can perceive no good reason why it should have been excluded. It is but natural that the prisoner would have been more or less excited and provoked in proportion to the force and aggravating character of the blow which he may have received from the deceased. It is usual for the jury to enquire into the nature of any wounds that may be found upon both the deceased and prisoner, after the conflict between them, and to draw such conclusions from them as they may deem legitimate.

10. Walker, a witness for defendant, testified that Harvey, a deceased witness, stated to him "that Wicker had made threats about Atkins, but what they were was not said. He never told Atkins, as he recollects. He mentioned it in Atkin's family. Does not know that he ever heard any threats made by Wicker against Atkins, which he informed Atkins of before Wicker's death.

The defendant then proposed that the witness should refresh his recollection by referring to his own deposition given before the committing court, to which the State objected, the court sustained the objection, and defendant excepted.

The examination before the magistrate occurred in January, 1853, the final trial in December, 1854.

At the time the witness was examined before the magistrate, incidents previously occurring within his knowledge, may have been fresher in his memory, than at the time of the trial; and, in such case, the law is well established that he may refresh his memory by referring to his former deposition. 1 *Greenleaf's Ev.*, *section* 556, *and cases cited in note; Roscoe's Criminal Evidence* 65, 171.

The court should have permitted the witness to refer to his former deposition to refresh his memory, and if it called to mind any fact that had escaped his recollection, the court then could have determined upon its competency or relevancy.

11. It appears from the bill of exceptions, that when the jury were about to retire to consider of their verdict, the prosecuting attorney moved that they should be permitted to take with them the transcripts of the record of the cause sent to the Union Circuit Court on the change of venue from Columbia, which contained all the evidence given before the committing magistrate, and certified to the Columbia Circuit Court. To this the defendant objected, but the court overruled the objection, and permitted the jury to take with them the transcript, "but *instructed* them that they must not read said record, but that it contained the indictment, and they should endorse their verdict on said record."

And the jury were permitted to retain said transcript in their possession until they returned their verdict. To all of which the defendant excepted. The bill of exceptions sets out the entire transcript.

The practice usually prevails in this State, for the jury to return their verdict in writing, endorsed upon the indictment, and it was perhaps to conform to this practice that the court permitted the jury to take with them the transcript containing the indictment, charging them not to read its contents. But there was no necessity for this, because we have no statute requiring the jury

to return their verdict in writing, nor was it required by the common law. The foreman announced their verdict orally, and the clerk entered it in proper form upon the record. See 1 *Chitty Crim. Law* 635.

Mr. WHARTON says, (*American Criminal Law*, *p.* 901,) "if the jury receive papers not submitted in evidence, or conditionally, or imperfectly submitted, the verdict will be set aside, in civil cases, if resulting for the party concerned in the irregularity, and in criminal cases, it would seem in all cases whatever, if there be a conviction, unless it appear that the error was the result of the misconduct of the defendant himself. Where the solicitor for the plaintiffs, after the evidence was concluded, delivered a bundle of depositions to the jury, a portion of which were not in evidence, the verdict for the plaintiff was set aside, though the jury swore they had not opened the bundle; (2 *Hale P. C.* 308,) and in Massachusetts, where through mistake, a similar paper, containing material evidence for the party ultimately prevailing, found its way to the jury box, the same result took place, (*Whitney vs. Whiteman*, 5 *Mass.* 405). Subsequently, however, in a case of the same character, this opinion was reviewed, and it was held that where the paper was taken out by the jury through accident, and it was shown that it was not opened, this of itself did not vitiate the verdict, but where it was delivered by design, or where being opened, it made for the prevailing party, the case was otherwise. *Hix vs. Drury*, 5 *Pick.* 296. In New York *Hackley vs. Hastie*, 3 *John.* 252, and Pennsylvania *Sheaff vs. Gray*, 2 *Yeates* 273, the same distinction has been followed, and such may be considered the settled law." See the authorities cited by *Wharton* in the margin.

Here the transcript was delivered to the jury at the instance of the State, in whose favor the verdict was returned. The depositions taken before the examining court, contained irrelevant and incompetent matter on both sides, and no showing appears to have been made that they were not read by the jury. The prisoner, perhaps, would not have been permitted to introduce affida-

vits of the jurors to impeach their verdict by showing that they read the contents of the transcript against the express charge of the court. See *Stanton vs. The State*, 13 *Ark. R.* 317; *Pleasants vs. Heard*, 15 *Ark.*

We think the court erred in permitting the jury to take with them, and retain in their possession, the transcript.

12. The eleventh ground assigned in the motion for a new trial, is that the verdict of the jury was contrary to law and the testimony in the case.

If this were the only ground assigned for setting aside the verdict, we should not hesitate to affirm the judgment of the court below refusing a new trial, it being the province of the jury to determine upon the sufficiency of the evidence to warrant the verdict rendered by them.

13. The last ground, upon which the motion for a new trial was based, is, that the court erred in the instructions given to the jury, on the part of the State, &c.

Without stating the substance of the evidence introduced by the parties upon the trial, it is deemed sufficient to remark that none of the instructions were abstract, if unobjectionable in other respects. They are as follows :

1st. That if the jury believe, from the testimony, that Atkins, the prisoner, went to Wicker's house, on the night of the homicide, *for the purpose of a difficulty with Wicker*, and in that difficulty killed him with a deadly weapon, he is guilty of murder."

This instruction seems to make the guilt or innocence of the accused turn exclusively upon the purpose for which he may have gone to the house of the deceased, and the use of a deadly weapon, regardless of the facts attending the difficulty which ensued—the conduct of the parties in bringing it on—and the circumstances under which the weapon was used.

If the prisoner went to the house of Wicker with a hostile purpose, or for the purpose of getting into a difficulty with him, and if he used a deadly weapon in the fight, these were facts to be considered by the jury, in passing upon his guilt or innocence,

or in determining the grade of his offence, but these alone, regardless of all other circumstances attending the difficulty, would not necessarily make him guilty of murder. See *Yoes vs. The State*, 4 *Eng. R.* 42.

This instruction was, therefore, erroneous in the form in which it was given.

2d. That if the jury believe, from the testimony, that prisoner went to the house of Wicker, for a lawful and friendly purpose, but that after getting there, he got into a quarrel with Wicker, and without any previous malice, proposed or accepted a combat with Wicker, and that in that combat killed him with a deadly weapon : that then the offence is at least manslaughter, and they can so find.

3d. That if the jury believe, from the testimony, that Atkins asked Wicker to strike him, intending to use a deadly weapon, that Wicker did strike him with his fist or hand, and that Atkins then killed Wicker, with such deadly weapon, that he is guilty of murder, and they should so find.

4th. That if the jury believe that Wicker assailed Atkins with insulting words and blows, and without the use of any weapon, and that Atkins, without attempting to evade the fight, killed him with a deadly weapon, he is guilty of manslaughter.

No substantial objection to these instructions is perceived, when considered in reference to all the evidence before the jury. See *Roscoe's Crim. Evidence, Titles,* MANSLAUHTER, MURDER.

5th. That no threats made by the deceased before the homicide will extenuate the offence or reduce it to manslaughter, if the combat were sought, or willingly entered into by the defendant, *the deceased being unarmed,* and the defendant *using a deadly weapon, likely to produce death.*"

This instruction would seem to assume that the deceased was unarmed, and that the defendant did use a deadly weapon, likely to produce death. It should have been so framed as to leave to the jury the fact whether or not the deceased was unarmed, and whether the prisoner used a deadly weapon. In others respects, the instruction is unobjectionable.

Upon the whole record, considering all the errors of the court above specified together, we think the verdict should be set aside.

The judgment of the court below is, therefore, reversed, and the cause remanded with instructions to grant a new trial, and that the cause progress according to law, and not inconsistent with this opinion.