COURT OF OYER AND TERMINER AND GENERAL GAOL DELIVERY.

## The COMMONWEALTH *against* CLUE.

The court, even in a capital case, may discharge a jury, before verdict, in a case of abso-
lute necessity; but mere inability to agree does not constitute such a case; nor does it
arise from the illness of some of the jury rendering them incapable of continuing longer
in a state of privation and restriction, without endangering their lives, if such illness can
be removed by permitting them to have refreshments, and the court against the consent
and prayer of the prisoner, refuse such refreshments, unless a majority of the jury agree
to receive them, which they decline.
If a jury has been discharged before verdict, under such circumstances, the prisoner may
plead them in bar of another trial.

*Johanna Clue*, had been indicted and tried, for the murder of her
husband before his Honour Judge King and his associates, holding a
court of Oyer and Terminer for the City and County of *Philadelphia*,
in the month of *April* 1831, when the jury not being able to agree,
the court discharged them for the reasons which will be detailed
hereafter.   She was arraigned again for the same offence, at the pre-
sent sessions of the court of Oyer and Terminer held by the Chief
Justice and Judge Kennedy, when she pleaded *autre fois acquit;*
and also, " that on the said indictment, at the said court of Oyer and
Terminer and General Gaol Delivery on Thursday the 12th of *April*
aforesaid, the said defendant in due form of law was arraigned and
pleaded not guilty of the premises contained in the said indictment,
and for her trial put herself upon God and her country, and was by
the said Commonwealth in due form of law placed on her trial before
a jury of the said country.   And the said *Johanna Clue*, further says,
that on the 21st, 22nd and 23rd days of *April*, aforesaid, the witnesses
were examined in due form of law, before the said court and jury as
well on behalf of the said Commonwealth as her the said defendant:
That the counsel for the Commonwealth and the defendant then ad-
dressed the court and jury in due form of law : That on the evening
of the 23rd day of *April* aforesaid, the court charged the jury relative
to the premises contained in the said indictment as set forth and that
the said jury then according to law retired to deliberate on their
verdict: That on Monday the 25th day of *April* aforesaid, at ten
o'clock in the forenoon of that day, the said jury came into the said
court, and answered to their names and declared that they had not
agreed upon their verdict, and that they did not think they were
likely to agree upon their verdict : That two of the jury, *viz. E.
Furguson*, and *A, Hooten*, then and there stated that they were un-
well, and one of the jury, *viz. E. Furguson*, then and there declared
that if he were much longer confined in his present state of privation

his life would be endangered : That one of the jury, *E. Furguson*, being duly sworn before the said court, declared that he was seventy six years of age : That the health of him the said *E. Furguson* was greatly impaired by an attack of illness from which he, the said *E. Furguson*, had only been relieved about a month : That he the said *E. Furguson*, from his peculiar state of privation and suffering was so ill and feeble, that he could not walk into court without assistance, and that he, the said *E. Furguson*, firmly believed that if he should be compelled to continue on the said jury any further length of time under his then state of privation and restriction, the life of him, the said *E. Furguson* would be in danger. And *Andrew Hooten*, another of the said jury, being duly affirmed according to law, declared, that he was then quite ill : That he had been confined all the month of *December*, then next preceding, with bilious fever : That the effects of this attack, still left his frame debilitated, and that he firmly believed that his health would be in danger by being kept longer on the jury, under his then state of privation and restriction, as ordered by the court : That the jury was then ordered by the court to withdraw to their room where they had been deliberating, and Dr. *Joseph Klapp*, a physician of great respectability, was then and there directed by the court to visit the said jurors who alleged that they were sick : That the said Dr. *Joseph Klapp*, did so visit the jurors in their room, in the absence of the defendant and her counsel, and without their consent, and returned to the said court and being then for the first time sworn, did depose that he had attended the said *E. Furguson*, about a month previous to the said time, the said *E. Furguson* having then a disease of the brain, and that the life of the said *E. Furguson* would, in the opinion of the said *Joseph Klapp*, be endangered by a continuance of his present state of privation and restriction, as it might produce a return of the disease. And the said Doctor *Joseph Klapp*, then and there further deposed as his opinion to the said court, that the life of the said *Andrew Hooten*, was not in immediate danger, but that he was ill and that his health would be endangered, if he continued to remain in his present state of privation and restriction. And the said *Johanna Clue*, further says, that at half past twelve o'clock in the afternoon of the same day, the said court ordered the said jury to be brought into court, and the said jury being then and there asked if they had agreed upon their verdict, answered that they had not. And the said court, then and there, without and against the consent of the said *Johanna Clue*, ordered the said jury to be dismissed, the said court declaring then and there their opinion that a case of necessity for the discharge of the said jury, as contemplated by the Supreme Court of this Commonwealth, in the case of the *Commonwealth* v. *Cook*, had been made to appear. And the said *Johanna Clue* further says, that during all this time, *viz.* from Saturday the 23rd of *April*, from half past ten o'clock in the evening, of that day, until *Monday* the 25th day of *April*, at half past twelve o'clock in the afternoon of that day, the

said jury, were kept by order of the said court without meat or drink, but had the use of fire and candles, and that during the trial the said jury were allowed to eat and drink. And the said *Johanna Clue,* further says, that after the said jury had been without meat or drink for the space of twenty-four hours, the said court, then and there after asking the consent of the commonwealth, and the defendant, authorised the said jury to take some refreshment, if a majority of the said jury would agree to the same, but that a majority of the jury would not agree to the taking of such refreshment, at that time, until the verdict was agreed upon, after which declaration, the said court refused to grant permission to any one of the said jury to take any food or refreshment whatever. And the said *Johanna Clue,* further says, that during the time of the privations and restrictions of the said jury, the said defendant prayed the said court, that the said jury, or any of them might take food and refreshments, and after the declaration of the said jurors, that they were sick, the said defendant then prayed, that the said sick jurors, might be allowed food and refreshment, all which said praying of the said defendant the said court then and there refused. And the said *Johanna Clue,* further says, that she the said *Johanna Clue,* now here pleading, and the said *Johanna Clue,* in the said indictment last mentioned, is the same identical person," &c. &c.

To the defendant's first plea, the Attorney General replied *nul tiel record,* and to her special plea he demurred.

*Ash* Attorney General and *Jack,* for the Commonwealth.

*Swift,* and *J. Randall* for the prisoner.

The opinion of the Court was delivered by

GIBSON, C. J.—It is not intended to treat the question presented by this demurrer, in the various aspects in which it has been viewed at the argument. The subject has been exhausted by several of the most learned and able judges of our country; and had we even the vanity to deem ourselves competent to shed new light on it, an attempt to do so, would have been prevented by the press of business that has occupied our attention during the short period that has been afforded. But we have meditated no such attempt. Our object is not to produce new arguments to sustain or overthrow our own decisions, but to repose on them so far as they go, as all-sufficient and incontrovertible authorities. Haply the *Commonwealth* v. *Cook* covers the ground of the argument here; and on the authority of that case we mean to rule the present. Although its principles may not be in accordance with decisions in our sister states, and in the courts of the union, it is nevertheless, as regards *Pennsylvania,* the law of the land; and we submit to it without reluctance. By this remark I am far from wishing to intimate a doubt of its solidity. Sitting at the time in another court, I took no part in it; but had it been brought before the court in bank by reason of doubt or hesitation on the part of the eminent men by whom, it was decided, it would with the exception of

(Commonwealth *v.* Clue.)

an inadvertent expression of the Chief Justice, presently to be noticed, have received from me a hearty concurrence. The confidence 1 put in the soundness of their judgment is unshaken by any thing discoverable in the decisions that have since been made. Why it should be thought that the citizen has no other assurance than the arbitrary discretion of the magistrate, for the enforcement of the constitutional principle which protects him from being twice put in jeopardy of life or member for the same offence, I am at a loss to imagine. If discretion is to be called in, there can be no remedy for the most palpable abuse of it, but an interposition of the power to pardon, which is obnoxious to the very same objection. Surely every right secured by the constitution, is guarded by sanctions more imperative. But in those states where the principle has no higher sanction than what is derived from the common law, it is nevertheless the birth right of the citizen and consequently demandable as such. But a right which depends upon the will of the magistrate is essentially no right at all; and for this reason the common law abhors the exercise of a discretion in matters that may be subjected to fixed and definite rules. I take it on grounds of reason as well as of authority, then, that a prisoner, of whom a jury have been discharged before verdict given, may, by pleading the circumstances in bar of another trial, appeal from the order of the court before which he stood, to the highest tribunal in the land. Nor do I understand how he shall be said not to have been in jeopardy before the jury have returned a verdict of acquittal. In the legal, as well as the popular sense, he is in jeopardy the instant he is called to stand on his defence; for from that instant, every movement of the Commonwealth is an attack on his life: and it is to serve him in the hour of his utmost need that the law humanely adds to the joinder of the issue, a prayer for safe deliverance. The argument must therefore be, that he is not put *out* of jeopardy unless by a verdict of acquittal; and that to try him a second time, having remained in jeopardy all along, is not to put him in jeopardy twice. In this aspect, it must be obvious that the argument is an assumption of the whole ground in dispute. If the prisoner has been illegally deprived of the means of deliverance from jeopardy, every dictate of justice requires that he be placed on ground as favourable as he could possibly have attained by the most fortunate determination of the chances.

The *Commonwealth* v. *Cook*, then, establishes that the court may discharge the jury of a prisoner capitally indicted only in a case of absolute necessity, to constitute which, it is necessary that there be some other ingredient beside mere inability to agree. The additional ingredient on which reliance is placed here, was the supposed disqualification for further consultation of two of the jurors by extreme sickness, which it was believed endangered their lives. The facts which appear on the pleadings are these: the jury retired to consider of their verdict on Saturday evening at half past ten o'clock, and returned to the bar at ten o'clock in the forenoon of the Monday fol-

(Commonwealth *v.* Clue.)

lowing, declaring they were not likely to agree; and two of them complained of being unwell, one of whom expressed a belief that if he were much longer confined in the state of privation in which he was placed, his life would be endangered. Being then sworn, he deposed that he was seventy-six years of age; that his health was greatly impaired by an attack of illness from which he had been relieved but a month before; that he was so feeble from privation and suffering as not to walk without assistance, and he firmly believed that if he were kept any further time *in the state of restriction and privation* in which he then was, his life would be put in danger. The other juror also testified that he was quite ill; that a bilious fever with which he had been confined a few months preceding, had left his frame debilitated; and that he firmly believed his health would be in danger *were he longer kept in the state of privation and restriction in which he then was.* A respectable physician who had been ordered to visit the indisposed jurors in consequence of these representations, deposed that he had attended one of them a month before in a disease of the brain; and that his life would be put in danger *by his being retained in the state of privation and restriction in which he was then placed,* as it might produce a return of the disease: that the life of the other juror was not in immediate danger; but that he was ill, and his health would be endangered, were he to remain *in a state of restriction and privation.* In consequence of this examination the jury were discharged at half past twelve o'clock of the same day, without the consent of the prisoner, and having been kept together during thirty-eight hours, without meat, drink, or refreshment. But previous to their discharge, and when they had been so kept together for twenty-four hours, the court, with the assent of the Commonwealth and the prisoner, ordered them refreshment, on condition that a majority of them would consent to receive it; but the refreshment so ordered was refused. The prisoner not only consented to the granting of food and refreshment at all times, but after the condition of the two jurors was made known, prayed the court to allow whatever should be necessary, especially to those who were indisposed. From the facts thus stated, it distinctly appears that the jury were kept without food or refreshment against the prisoner's consent; and that in consequence of the illness of two of the number occasioned by abstinence, and which might consequently have been removed by the administration of nourishment, they were discharged against her consent.

It is evident that the course pursued by the judge, was thought by him to be dictated by a passage in the opinion of the Chief Justice in the *Commonwealth* v. *Cook;* and it is but just to say, that viewing the matter as it was perhaps his duty to do, it is not easy to see how the result at which he arrived, could have been avoided. "But a case may arise," the Chief Justice had said, 6 *Serg. & Rawle,* 587, "in which a jury may find great difficulty in agreeing, and some of them may be so exhausted as to put their health in danger. No one can think for a moment that they are to be starved to death. God

(Commonwealth *v.* Clue.)

forbid that so absurd and inhuman a principle should be contended for. The moment it is made to appear to the court by satisfactory evidence, that the health of a single juryman is so affected as to incapacitate him to do his duty, A CASE OF NECESSITY HAS ARISEN, which authorizes the court to discharge the jury." It is evident from this that the exhaustion of a juror from privation was viewed by the Chief Justice, as a case that might legitimately arise; and undoubtedly the supposition is consistent with principles that were applicable to trial by jury, in the earlier periods of the law. It is scarcely to be doubted that the original object of keeping a jury together without meat, drink, fire, or candle, was to extort the concurrence of those who would otherwise have withheld it; for though Sir *Matthew Hale* in his Pleas of the Crown, 297, declares that "men are not to be *forced* to give their verdict against their judgments," it is said in a curious note appended to the remark, that "it is not a force when any of the jurors are compelled to comply under the peril of being starved to death; for how can it be expected," demands the annotator, "that twelve considering men should in all cases happen to be of the same sentiments." It is certainly easier to answer his question, than assent to the truth of his remark. Originally, it would seem, refreshments were not allowed even by consent of the prisoner; and it was left to modern times, as is justly remarked by Mr. *Justice Duncan,* in the *Commonwealth* v. *Cook,* to allow them, at first by consent, and afterwards by the inherent power of the court; so that the use of hunger as an instrument of compulsion, like many other matters, such as fining jurors for obstinately holding out, seems to have passed away with the darkness in which it was engendered. The ancient form of the tipstaff's oath indeed remains; but with the implied qualification of being controuled by the directions of the court, it affords an admirable security against abuses that would infallibly rush in were jurors allowed an unlimited licence to receive refreshments at their pleasure, or through any other channel than the order of the court. Through that channel, a reasonable supply at the public charge, and in quantity so restricted as to guard against excess, is a matter not of indulgence, but of right, appertaining to the jurors, not as a body, but as individuals, and without being subject to the controul of the majority. What was said by Chief Justice TILGHMAN, in the passage just quoted, was doubtless drawn from recollection, and used in illustration of the matter more immediately before the court. The application of torture, in order to force the conscience, was abhorrent to every feeling of his nature; and had the attention of that humane and excellent judge been drawn directly to the subject by the occasion, there is little hazard in affirming that the result would have been the adoption of a sentiment in accordance with that which is now expressed.

If then, the indisposition of the jurors was induced, without the prisoner's assent, and might have been removed, what was the course dictated by analogy from parallel cases? Undoubtedly to recruit their

(Commonwealth v. Clue.)

forces by food and refreshment. If a juror be taken ill, says Mr. 1 *Chitty*, Cr. *Law*, 529, another juror may be permitted to attend him : and if it appear that there is a probability of a speedy recovery, he may be allowed proper refreshment. It is only in the absence of a probable ability to return to his duties, that a new panel may be ordered. There cannot be a doubt that the indisposition of the two jurors here, would have been speedily removed by appropriate nourishment; and their temporary exhaustion therefore was not an available ground to divest the interest which the prisoner had in the verdict. Her plea of *auter fois acquit,* has not been mentioned by the production of a sufficient record ; but her other special plea is available in law, and we are of opinion that the demurrer be overruled: She is therefore discharged.

The prisoner discharged.