*Ex parte* ULRICH.

*(District Court, W. D. Missouri, W. D.* June 23, 1890.)

1. CONSTITUTIONAL LAW—DUE PROCESS OF LAW—FORMER JEOPARDY.
   Since it is a principle of the common law that no one shall be twice placed in jeopardy for the same offense, the trial and commitment of one who has already been tried and acquitted of the same offense is depriving him of his liberty "without due process of law," within the meaning of Const. U. S. Amend. 14.

2. SAME—DISCHARGE OF JURY—FORMER ACQUITTAL.
   Where, after a person has pleaded not guilty, and been put on trial for a felony, and evidence has been introduced by the state, the judge adjourns the case to take up the trial of another set for that day, and on the adjournment day, on the ground that he is unwell, discharges the jury without the prisoner's consent, the discharge is equivalent to an acquittal; and he cannot be again tried for the same offense.

3. SAME.
   Const. Mo. § 23 of the bill of rights, providing that "no person, after having been once acquitted by a jury," shall again be put in jeopardy, but, if the jury "fail to render a verdict, the court before which the trial is had may, in its discretion, discharge the jury, and commit the prisoner for trial at the next term of the court," etc., does not give the court a right to commit a prisoner for a second trial after discharging the jury without legal cause.

4. SAME.
   Const. U. S. Amend. 14, providing that no "state" shall deprive any person of life, liberty, or property without due process of law, applies equally to the act of a state judge.

At Chambers. On *habeas corpus.*
*Crittenden, Stiles & Gilkeson,* for petitioner.
*A. R. Strother,* for the State.

PHILIPS, J. This application for writ of *habeas corpus* grows, substantially, out of the following state of facts: The petitioner was indicted by the grand jury in the state criminal court of Jackson county, Mo., for the crime of bigamy. He was arraigned, and entered a plea of not guilty. The case coming on for trial on the 21st day of April last past, a jury was duly impaneled and sworn to try the case. The opening statement of counsel was made to the jury, and the state introduced and examined one witness for the prosecution on that day. The trial of the cause was then adjourned to the usual hour of the following day. On the 22d of April the trial was resumed in the forenoon, and a number of witnesses examined on the part of the state, when certain record evidence was offered by the state, which would have about concluded the evidence on its part. Discussion arose as to the admissibility of this record evidence about the noon hour. On suggestion by counsel

. that the court might then adjourn until after dinner, the court observed that there was a matter of small importance, or something of that tenor, to come up that afternoon, which would probably occupy a few hours, and said he would adjourn the further trial of the case until next morning at 10 o'clock, which was so ordered without objection. Although the prisoner was under the usual bond for his appearance, the court, according to what seems to be its practice, after the trial of an accused on bail has begun, ordered the prisoner into the custody of the marshal, who placed him in jail. On the following morning, the 23d, counsel for the prisoner appeared in court at the designated hour of said adjournment, expecting to proceed with the trial of said cause, when they discovered for the first time that, on the afternoon of the day preceding, another case, *State* v. *Wheeler*, had been taken up for trial before a jury before another judge specially seolected therefor, and was then in progress. The regular judge of the court was not then present, nor was the prisoner brought into court. The prosecuting attorney announced to the jury and witnesses that they need not attend court further in the case of *State* v. *Ulrich*, until 2 o'clock P. M. of that day, whereat jury and witnesses dispersed, without more. About 3 o'clock P. M. of that day the judge of the court appeared, and, the trial of the *Wheeler Case* yet being in progress, announced that the case against Ulrich would not be called until the following morning. This was repeated until Saturday morning, the 26th day of April. The Wheeler trial was concluded on the evening of the 25th of April. During all these acts and adjournments the prisoner was not present, and was confined in jail, and gave no consent to the proceedings. On the morning of the 26th the court announced that he was not feeling well enough to proceed with the trial, and ordered, against the objection of the prisoner's counsel, that the jury in the case be finally discharged therefrom, and the cause be continued for further trial until the 26th day of May, following, before another jury; and the prisoner was remanded to jail. The evidence shows that, after the court made the foregoing order, it remained in session an hour or so, transacting other business, and then adjourned court until the 5th day of May following. On the 26th day of May, the day the *Ulrich Case* was set down for another trial, counsel for prisoner appeared, and filed motion in the nature of a plea in bar, asking that the defendant be discharged on the ground that he had already been placed in jeopardy, and, in legal effect, acquitted, by the former proceedings in the case. This motion was overruled, and the defendant again put to trial before another jury. He was found guilty, and sentenced to a term of imprisonment in the state penitentiary for two years. After an ineffectual motion in arrest and for new trial, the prisoner has presented to this court his petition for discharge by the writ of *habeas corpus*, on the ground that his imprisonment is in violation of the fifth and fourteenth amendments to the federal constitution.

By Act Cong. approved Feb. 5, 1867, jurisdiction is conferred on United States district courts, and judges thereof, "to grant writs of *habeas corpus* in all cases where any person may be restrained of his or

her liberty in violation of the constitution, or of any treaty or law of the United States." To bring the application, therefore, within the terms of the act, it must be made to appear that the petitioner is restrained of his liberty in violation of the constitution of the United States. Assuming for the present that the first submission of the petitioner's case to the jury, and the jury's discharge by the court, was, in legal effect, a discharge or acquittal of the defendant therein, is the further confinement in jail violative of any right of the petitioner secured by the constitution of the United States? The fifth amendment to the federal constitution provides that—

"No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury. * * * Nor shall any person be subject, for the same offense, to be twice put in jeopardy of life or limb. Nor shall be compelled, in any criminal case, to be a witness against himself, nor be deprived of life, liberty, or property without due process of law," etc.

It is the settled construction of this amendment, that it was not designed to operate as a limitation upon the state governments in reference to their citizens, but was adopted exclusively as a restriction upon federal power. *Barron* v. *City of Baltimore*, 7 Pet. 243; *Fox* v. *Ohio*, 5 How. 434; *Twitchell* v. *Com.*, 7 Wall. 321. The fourteenth amendment declares that—

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction equal protection of the laws."

This is an express limitation upon the powers of the state government. It opens with the suggestive declaration of the dual citizenship of all persons, native and naturalized, and then, in recognition of the maxim of free governments that the obligation of allegiance is correlative with the duty of protection, it declares that no state shall by any law abridge any of the privileges or immunities secured to the citizens of the United States, nor shall the citizen be deprived of life, liberty, or property without due process of law. What is the purport of the term "due process of law?" Kent, in his Commentaries, says:

"It may be received as a proposition universally understood and acknowledged throughout this country that no person can be taken or imprisoned, or disseised of his freehold or estate, or exiled, or condemned, or deprived of life, liberty, or property, * * * unless by the law of the land. * * * The words ' by the law of the land,' as used originally in *Magna Charta*, in reference to this subject, are understood to mean due ' process of law.' * * * The better and larger definition of ' due process of law ' is that it means law in its regular course of administration through courts of justice." Volume 2, p. 13.

So the supreme court of the United States, in *Murray* v. *Improvement Co.*, 18 How. 272–276, speaking of this process, said:

"The article is a restraint on the legislative, as well as on the executive and judicial, powers of the government, and cannot be so construed as to leave congress free to make any process due process of law by its mere will. To what principles, then, are we to resort to ascertain whether this process enacted by congress is due process? To this the answer must be twofold. We must examine the constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country."

As there is, confessedly, nothing in the constitution itself in conflict with the idea that the citizen cannot be twice placed in jeopardy for the same criminal offense, in following the direction of the supreme court, we will find no principle of the common law, grounded upon the great rock of the *Magna Charta*, more firmly rooted than that no man shall be twice vexed with prosecutions for the same offense. That was as much "the law of the land" as that he should not be tried or condemned without process of law, and the judgment of his peers. Mr. Justice MILLER, in *Ex parte Lange*, 18 Wall. 163, said:

"If there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offense. * * * The principle finds expression in more than one form in the maxims of the common law. * * * In the criminal law the same principle, more directly applicable, * * * is expressed in the Latin, '*nemo bis punitur pro eodem delicto*,' or, as Coke has it, '*nemo debet bis puniri pro uno delicto*.' * * * The common law not only prohibited a second punishment for the same offense, but it went further, and forbid a second trial for the same offense, whether the accused had suffered punishment or not, and whether in the former trial he had been acquitted or convicted."

Then, quoting the language of MILLS, J., in *Com. v. Olds*, 5 Litt. (Ky.) 137, as follows:

"Every person acquainted with the history of governments must know that state trials have been employed as a formidable engine in the hands of a dominant administration. * * * To prevent these mischiefs the ancient common law, as well as *Magna Charta* itself, provided that one acquittal or conviction should satisfy the law, or, in other words, that the accused should always have the right secured to him of availing himself of the pleas of *autrefois acquit* and *autrefois convict*. To perpetuate this wise rule, so favorable and necessary to the liberty of the citizen in a government like ours, so frequently subject to changes in popular feeling and sentiment, was the design of introducing into our constitutions the clause in question."

And responsive to this same authority, and in recognition of the universality of the principle in question, the learned judge in *State v. Cooper*, 13 N. J. Law, 361, said:

"Our courts of justice would have recognized and acted upon it as one of the most valuable principles of the common law without any constitutional provision. * * * And all who are conversant with courts of justice * * * must be satisfied that this great principle forms one of the strong bulwarks of liberty."

So the supreme court of the United States says:

"It is contrary to the nature and genius of our government to punish an individual twice for the same offense." *Moore* v. *People*, 14 How. 21.

That this rule of universal justice and law owes not its origin to constitutional declarations, but was designed only to emphasize and preserve it, see *Lee* v. *State*, 26 Ark. 260; *State* v. *Snyder*, 98 Mo. 555, 11 S. W. Rep. 1036; *Ex parte Snyder*, 29 Mo. App. 261. And Cooley, in his work on Constitutional Limitations, (section 36,) says:

"We must not commit the mistake of supposing that, because individual rights are guarded and protected by them, [constitutions,] they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed."

As expressive of how deeply rooted this principle of the common law has ever been in the minds and convictions of the American people, as their common, inestimable, heritage of liberty from the institutions and usages of the mother country, the colonists, long before the adoption of the constitution, incorporated the provision respecting due process of law, or the law of the land, in all their local governments; and there has not been a constitution, state or federal, adopted on this continent, which does not contain the provision against double trials and punishments, or punishment after acquittal. It is imbedded in the very bonework of our political and judicial system. Compelled, as the learned counsel for the state is, to admit this historic truth, he ingeniously sought on the argument of this cause to maintain the proposition that the term "due process of law," as employed in the fourteenth amendment, was not designed by its framers to extend to and embrace the instance of a double jeopardy in a criminal prosecution, for the reason that the same provision found in the fourteenth amendment also appears in the fifth amendment, in which is the clause prohibiting the placing of the citizen in jeopardy twice for the same offense; and he relies upon the statement of Mr. Justice MATTHEWS in *Hurtado* v. *California*, 110 U. S. 534 *et seq.*, 4 Sup. Ct. Rep. 111, 292, to the effect that the term "due process of law" is employed in the fourteenth amendment in no different sense from that in the fifth amendment, and that, if "it had been part of its purpose to perpetuate the institution of the grand jury in all the states, it would have embodied, as did the fifth amendment, express declarations to that effect." The contention of counsel is that, by parity of reason, inasmuch as the fifth amendment contained also an express provision against again vexing the citizen with prosecution after having once been in jeopardy, it would have been superfluous and repetitious to cover the same right under the clause respecting due process of law. It must be confessed that some expressions of the learned justice in this connection give color to such inference. But a closer examination of the context, as well as the whole debate on the question involved in that case, can leave little doubt that such first impression is quite superficial. A brief review of the California case, we think, will make this clear. The constitution of the state of California authorized the prosecution of persons on information. Hurtado was accordingly, on information, prosecuted and convicted of the crime of murder. He applied to the supreme

court of the United States to review the judgment of the state court, on the ground that the trial and conviction was not due process of law, within the meaning of the fourteenth amendment. The argument of Mr. Justice MATTHEWS, who wrote the majority opinion of the court, was to show that the presentment or indictment of a grand jury in cases of felony was not so established and fixed in the common law of England, as it existed at the time of the adoption of the federal constitution, that it could be regarded as a part of the law of the land, within the meaning of "due process of law." The opinion reviews the history of *Magna Charta*, and the comments thereon by Coke and other English authorities and judges, to show that presentment and indictment were not a part of the law of the land as secured by *Magna Charta*, and interwoven by usage in the practice of the courts of common-law jurisdiction; and for tha reason, although the fifth amendment provided that no person could be held to answer for a capital or otherwise infamous crime unless on presentment or indictment of a grand jury, it was not included within the terms of "due process of law," as employed in the constitution, as due process of law is process according to the law of the land as it existed by immemorial usage in England, and was transplanted by the colonists on this continent as a part of our heritage of liberty. Then, *arguendo,* the justice says:

"The natural and obvious inference is that, in the sense of the constitution, 'due process of law' was not meant or intended to include, *ex vi termini,* the constitution and procedure of a grand jury in any case. The conclusion is equally irresistible that, when the same phrase was employed in the fourteenth amendment to restrain the action of the states, it was used in the same sense, and with no greater extent."

And then, as evincive of the fact that it was in the mind of the court to exclude the right to a presentment by indictment from the term "due process of law," because such right was not a part of the law of the land in England, the opinion proceeds:

"Due process of law in the latter [the fifth amendment] refers to that law of the land which derives its authority from the legislative powers conferred upon congress by the constitution of the United States, exercised within the limits therein prescribed, and interpreted according to the principles of the common law. In the fourteenth amendment, by parity of reason, it refers to that law of the land in each state, which derives its authority from the inherent and reserved powers of the state, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions."

The opinion then proceeds to show that, by the term "due process of law," it was the design of the amendments to irrevocably secure the citizen or community against "arbitrary power enforcing its edicts to the injury of the persons and property of its subjects," as "essential to the preservation of public and private rights, notwithstanding the representative character of our political institutions." The opinion then quotes with approbation the language of the supreme court of Mississippi in *Brown* v. *Levee Commissioners,* 50 Miss. 468:

"The principle does not demand that the laws existing at any point of time shall be irrepealable, or that any forms of remedies shall necessarily continue. It refers to certain fundamental rights which that system of jurisprudence, of which ours is a derivative, has always recognized. If any of these are disregarded in the proceedings by which a person is condemned to the loss of life, liberty, or property, then the deprivation has not been by 'due process of law.'"

The opinion then, in express recognition of the true import of due process of law, concludes by saying that that proceeding is due process of law "which regards and preserves those principles of liberty and justice" which have come to us from immemorial usage as safeguards of personal liberty. If the contention of the state here be correct, that Mr. Justice MATTHEWS intended to assert the proposition that a second prosecution for the same offense after acquittal, or that the right of presentment by grand jury, are not included within the term "due process of law," simply for the reason that in the fifth amendment these rights were expressly protected, and that nothing else named in said amendment, therefore, could be regarded as coming within the protecting arms of the guaranty of due process of law, it would have been sufficient to have merely so asserted, and that would have ended the case. On the contrary, the elaboration of the proposition that the presentment by indictment could not be regarded as the law of the land within the meaning of *Magna Charta*, and usage in the common-law courts, and for that reason did not come within the meaning of "due process of law," extending over 17 or 18 pages of the reported case, leaves no room for doubt that, in the mind of the supreme court, had the right in question been part of the law of the land as hereinbefore defined, the appeal of Hurtado would have been well taken under the fourteenth amendment. This conclusion is made irresistible by the dissenting opinion of Mr. Justice HARLAN, 4 Sup. Ct. Rep. 292, whose great effort was to demonstrate the proposition that the necessity of a presentment by grand jury in such an offense, before the accused could be put to trial, was a firmly rooted principle of the common law, and was the law of the land as understood and recognized by the colonists and the framers of the federal constitution. And, to reduce the principles maintained by the majority opinion to the *argumentum ad absurdem*, Mr. Justice HARLAN contends that the position taken by them ought to lead to the monstrous conclusion that the term "due process of law," as employed in the fourteenth amendment, would not cover the instance of putting a citizen twice in jeopardy for the same offense, which evidently the court would not desire to have imputed to it. It is furthermore quite apparent that, in the opinion of Mr. Justice MILLER in *Ex parte Lange, supra*, 172, such a violation of the rights of the citizen in question here would have been cognizable by the federal court. In alluding to the case of *Moore* v. *People*, 14 How. 13, he says:

"But it was also urged that the party might be subjected twice to punishment for the same offense, if liable to be prosecuted under statutes of both state and national legislatures. In regard to this, Judge McLEAN said * * * that 'the exercise of such a power by the states would, in effect, be a violation of the constitution of the United States, and of the respective

states. They all provide against a second punishment for the same act.' 'It is contrary,' said he, 'to the nature and genius of our government, to permit an individual to be twice punished for the same act.'"

The case of the petitioner presents an instance of the most flagrant and reckless disregard of the rights of a citizen. He was arraigned, pleaded not guilty, and put himself upon a jury of the country. The state proceeded to lay before the jury much, if not the greater part, of its evidence. By the now well-recognized law of the land, the prisoner was then placed in jeopardy of his liberty, and was liable, without the power of retraction on his part, to conviction and infamous punishment. Cooley, Const. Lim. (5th Ed.) 399; *Ex parte Snyder*, 29 Mo. App. 256; *State* v. *Snyder*, 98 Mo. 556, 11 S. W. Rep. 1036; 1 Bish. Crim. Law, § 1045; *Pizano* v. *State*, 54 Amer. Rep. 511; *Roberts* v. *State*, 58 Amer. Dec. 536, and note; *State* v. *Redman*, 17 Iowa, 332; *State* v. *McKee*, 21 Amer. Dec. 499, and note. Instead of proceeding with the trial, the court, without disclosing the real purpose of the adjournment, adjourned the trial from noon until the following morning, and without the knowledge or consent of the prisoner, in his absence in jail, and in the absence of his counsel, the court permitted the trial of another cause to be taken up, which occupied four days of court, allowing the jury to separate at will, without any charge from the court; and the cause continued from day to day without the presence of the prisoner at any of these adjournments. Then, on the sixth day, the court, against the objection of the prisoner, discharged the jury which had partly heard the case, assigning as the reason therefor that he felt too unwell to proceed with the trial. He then ordered the case continued for a month, and again, against the plea of *autrefois acquit*, compelled the prisoner to submit to another trial before another jury, by which he was convicted. No authority of law can be shown for such a proceeding, and it is to be hoped it has no precedent under constitutional government. The discharge of the jury after trial begun, without legal necessity therefor, is in law tantamount to an acquittal. *Pizano* v. *State*, 54 Amer. Rep. 511; *Hilands* v. *Com.*, 56 Amer. Rep. 236; *State* v. *Calendine*, 8 Iowa, 292. In *Wright* v. *State*, 5 Ind. 292, the court say:

"Whenever a person shall have been given in charge on a legal indictment to a regular jury, and that jury unnecessarily discharged, he has been once put in jeopardy, and the discharge is equivalent to a verdict of acquittal. If a court has the right, during the trial, capriciously to discharge the jury, and continue the cause until the next term, * * * he might at every term impanel, discharge, and continue, and thus rob the prisoner of his liberty by preventing a final investigation. * * * We cannot regard the rule as wise or safe which places arbitrary or unguarded discretion in the hands of any one when it can be reasonably avoided."

In *Mitchell* v. *State*, 42 Ohio St. 383, the court say:

"If the jury be thereafter discharged without a verdict, where no legal ground of discharge is shown, the effect will be precisely the same as if a verdict of acquittal had been rendered."

In *Whitten* v. *State*, 61 Miss. 717, the court say·

"The power to dismiss a jury in prosecutions for a felony can never depend on pleasure. Such power is wholly dependent on necessity, either physical or legal. Where there is no necessity, there is no power."

Mr. Chief Justice GIBSON, in *Com.* v. *Clue*, 3 Rawle, 498, said:

"Why it should be thought that the citizen has no other assurance than the arbitrary discretion of the magistrate, * * * I am at a loss to imagine. If discretion is to be called in, there can be no remedy for the most palpable abuse of it but an interposition of the power to pardon, which is obnoxious to the very same objection."

Likewise, Mr. Chief Justice BLACK, in *McFadden* v. *Com.*, 23 Pa. St. 12, said:

"A discharge of the jury in a capital case after the trial has begun is not a continuance of the cause. It is the end of it. And, for all purposes of future protection, it is the same to the prisoner as an acquittal, unless it was done with his own consent, or demanded by some overwhelming necessity."

The fact that another case had been set for hearing on a day which intervened during the trial of this petitioner created no legal necessity for an interruption of petitioner's trial, already begun. The case on trial had the right of way, and nothing short of some providential interference, like the continued sickness of the judge, the sickness of a juror, or some like legal impediment rendering it physically impossible or illegal to proceed, could have justified such an interruption of the trial, and discharge of the jury. The asserted indisposition of the judge after the termination of the *Wheeler Case* cannot be regarded as the legal necessity impelling the discharge of the jury. The evidence before me, as well as the history of the case itself when it was tried, leave no doubt but that the trial of the petitioner's case, had it proceeded, would have ended long prior to the intervening sickness of the judge, in addition to which the evidence shows that the court, when it did discharge the jury, adjourned court over to the 5th day of May, when it was again in session. So there was no necessity for the discharge of the jury even upon the score of the temporary indisposition of the judge, as all these adjournments were during the same term of court. If, merely for the accommodation and convenience of other persons and cases, the case on trial may be pretermitted at the will of the trial judge, any number of cases may be sandwiched between the commencement and conclusion of the trial, and thus the defendant be kept indefinitely on the rack, tortured with the natural anxiety and dread sense of uncertainty as to his fate. Such a course of procedure would be as violative of the genius of our institutions of government as of the better instincts of humanity. The provision of the bill of rights which guaranties to the accused a speedy trial is just as effectual after the trial begins as it is before; and this violation of the prisoner's rights was intensified after so long a delay, during which he was confined in prison, by the unnecessary discharge of the jury. The law will give him the benefit of the presumption that the first jury might have acquitted him, and it is responsive to this beneficent spirit that such first trial amounts to an acquittal.

It is contended, however, on this branch of the case, by the prosecut-

ing attorney, that, in the state constitution, (section 23 of the bill of rights,) nothing short of a verdict of acquittal by the first jury can prevent a second trial of the prisoner; and the case of *State* v. *Jeffors,* 64 Mo. 376, is cited in support. In that case the record showed simply the trial of the defendant, the final submission to the jury, and then the discharge of the jury by the court. The fact was that the jury disagreed, and the record failed to show this fact, which omission of the record was sought to be remedied at a subsequent term by an entry *nunc pro tunc.* The plea of the former acquittal was interposed in bar of the second trial. The supreme court held that the entry *nunc pro tunc* was inadmissible, for the reason that there was no minute or memorandum of record in the trial court by which such subsequent entry could be made; and it was further held that under the state constitution the facts of that case did not amount to acquittal. The said section of the bill of rights provides that—

"No person, * * * after being once acquitted by a jury, be again, for the same offense, put in jeopardy of life or liberty; but, if the jury to which the question of his guilt or innocence is submitted fail to render a verdict, the court before which the trial is had may, in its discretion, discharge the jury, and commit or bail the prisoner for trial at the next term of court, or, if the state of business will permit, at the same term."

It was in discussing this state of the record, and as applied to the facts of the case, that Judge Norton observed that this provision of the constitution was intended in part to change the old common-law practice of confining the jury, to be fed on bread and water, until the end of the term, in order to compel a verdict, on pain of being transported in a cart around the circuit until a verdict was reached. "Strict as this rule was," says the opinion, "it was nevertheless within the power of the court to discharge a jury * * * for causes which could not be foreseen, * * * such as the sudden death of a juror during the progress of the trial. The provision above quoted declares in plain terms that nothing short of an acquittal by a jury shall prevent a second trial. This being its obvious meaning, we do not see how the trial court could have done otherwise than overrule the motion for the discharge of the defendant, as his right to a discharge * * * depended upon his acquittal by a jury, which the record in the case does not show." This language, of course, must be understood in reference to the facts of that case, and the peculiar grounds of the motion, for the judge further observes:

"It cannot, certainly, amount to an acquittal by the jury; for an acquittal by them can only be evidenced by their verdict, and the record before us shows no such verdict, but only that they retired to consider of their verdict. After the jury retires for this purpose, there are three ways in which they might lawfully be discharged: *First,* by returning into court a verdict for conviction or acquittal; *second,* by being discharged, by an order of court, because of their inability to agree upon a verdict, or by consent of defendant, or some unavoidable cause, such as the sudden death of a juror; and, *third,* by the expiration of the term of the court in which the trial is pending."

The opinion then proceeds to show that there was no discharge of the jury either on the first or second counts, but the conclusion reached by

the court, from the facts in the case, and the statutory period of the terms of court, was that the term of court expired while the jury were out, and that authorized the court to make the discharge. The opinion then concludes with this significant observation:

"We express no opinion as to the effect of an arbitrary, unwarranted discharge of a jury in a case of felony. The power to discharge for certain causes undoubtedly exists; but it should be exercised with great caution, as the citizen whose life or liberty is given to the hands of a jury is entitled to fair consideration by them, of which he should not be deprived by the arbitrary action of the court."

Still more conclusive of the fact that the supreme court of the state does not place the construction upon the provision of the bill of rights that the person is not in jeopardy until once acquitted by a jury, in the sense contended for by the state's attorney, the later case of *State* v. *Snyder*, 98 Mo. 556, 11 S. W. Rep. 1036, need only be cited. There the rule of having been once in jeopardy was applied to the instance of a second trial after one conviction. In that case the court say:

"It was a maxim and practice of the common law that no man was to be brought into jeopardy more than once for the same offense. * * * Where the jury was charged with the deliverance of the defendant,—that is, when they are impaneled and sworn,—the indictment being sufficient, and the court being possessed of jurisdiction, his jeopardy began."

But for the suggestion made by the state's attorney in the argument of this petition, it would scarcely be deemed necessary to say that the prohibition in the fourteenth amendment restricting the power of the state in the matter under consideration applies equally to the act of a state judge. It has "reference to the actions of the political body denominated a 'state,' by whatever instruments, or in whatever modes, that action may be taken. The state acts by its legislature, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the state, or of the officers or agents by whom its powers are exercised, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a state government, deprives another of property, life, or liberty without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and, as he acts in the name and for the state, and is clothed with the state's power, his act is that of the state. This must be so, or the constitutional prohibition has no meaning when the state has clothed one of its agents with power to annul or evade it." *In re Ah Lee*, 5 Fed. Rep. 902.

I recognize, in all its compass, the wisdom and policy of observing with scrupulous regard the proper line of demarkation between federal and state authorities. It is safest and best that each should move within the orbit of its own rightful and limited jurisdiction. This is essential to avoid needless friction and conflict. By observing the spirit of comity between the respective courts, harmony of action is promoted, and the essential autonomy of each is conserved. So, when this petition

was first presented on the discharge of the first jury, I deferred action, suggesting to petitioner's counsel that nothing short of a sense of the supreme necessities of the prisoner's condition could induce my interference. I preferred that the petitioner should wait and see whether or not the state court would again attempt to put him to trial before another jury. When the court did so, I again postponed the writ until after the hearing of the motion for new trial, which is recognized by the supreme court of the state as the due and golden opportunity of the trial court, on calmer deliberation, to rectify its errors committed in the progress of the trial. True it is the remedy yet remains to the prisoner to prosecute an appeal or writ of error to the state supreme court. The supreme court would not, however, grant the prisoner the speedier relief by writ of *habeas corpus*, as in such cases it only takes cognizance by writ of error or appeal. At this juncture of the case, I recall the utterance of Homer, that "on the first day of his servitude the captive is deprived of one-half of his manly virtue." Each hour of the petitioner's illegal restraint is not only a degredation in its tendency, but it is a crime against liberty. The supreme court will in a few days adjourn until October next. Under the most favorable conditions, no relief in that direction can possibly come to the petitioner for four months. He may be unable to obtain bail. Must he lie in jail, and go to the penitentiary, in violation of his constitutional right to be set free? Being invested with plenary jurisdiction for his protection, to fail to exert the power from an overscrupulous regard of the course of procedure in the state courts would be as timorous as it would be indefensible. Under a solemn sense of official duty, I must, therefore, order the prisoner's discharge from further custody. If, in this action, I err to the injury of the state, it has its redress by appeal to the higher federal courts.